**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Eugene L. DAWDY, Defendant–Appellee.**

No. 94–2679.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 12, 1994.

Decided Feb. 7, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied March 27, 1995.*

---

* McMillian, Circuit Judge, would grant the suggestion for rehearing en banc.

Timothy T. Jarman, Asst. U.S. Atty., for appellant.

Stanley E. Munger, Sioux City, IA. Also appearing on the brief was Paul M. Bengford, Sioux City, IA, for appellee.

Before BOWMAN, Circuit Judge, LAY, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The United States appeals the suppression of evidence supporting a charge against Eugene L. Dawdy of possession of methamphetamine with intent to distribute. The district court found that the police investigative stop that resulted in the charge was invalid from its inception; the court ruled, moreover, that even if the stop were valid, the subsequent search of the Dawdy's car was not reasonably related in scope to the purpose of the stop. The district court further concluded that Dawdy's resistance to arrest did not create an independent ground for arrest and search of his car. We reverse.

## I.

Shortly after 10:00 pm on Sunday, December 13, 1992, Iowa State Trooper Stuart Christians observed appellee Dawdy's automobile parked behind Greenville Pharmacy in Sioux City, Iowa. Christians knew that the pharmacy was not open 24 hours and that it was normally closed on Sunday night; he was, moreover, aware that there had been apparently false burglary alarms at the pharmacy on several other occasions. The parking lot was otherwise empty, and Dawdy's car was situated at some distance from either the entrance to the pharmacy or the surrounding homes. Although the car was occupied, its lights were off.

Christians entered the parking lot in order to investigate. As he did so, Dawdy turned his car around and drove toward the same entrance to the lot. Christians stopped, left

the squad car, and held up his hand to indicate that Dawdy should stop. Dawdy backed his car in the opposite direction, and Christians turned on the flashing lights on top of the squad car. Dawdy stopped. The trooper then asked Dawdy what he was doing, and Dawdy responded that he was just turning around. After Christians informed Dawdy that he had seen the car parked in the lot, Dawdy claimed that he was waiting for someone. Christians took driver's licenses from both Dawdy and his passenger, David P. Pinney, and asked the communications center to run warrant checks. Although there were no outstanding warrants, Dawdy appeared nervous, shifted in his seat, and opened the car door several times as if to exit. During this time, a pickup truck pulled in behind the squad car. Because Christians was alone and did not want anyone at his back, he asked the driver, Doug Cooper, to leave. Cooper said that he had come to the lot to wait for someone, but he eventually agreed to leave.

Other law enforcement officers arrived soon afterwards, including Iowa State Trooper Gambel and Woodbury County Deputy Sheriff Boetger with his police dog, which is used both to control situations and to detect controlled substances. At no time did the dog actually assist the officers. Christians noticed Dawdy drop a key from the open window of his vehicle, picked the key up, and returned it. Gambel then found a black leather pouch containing a white, powdery substance lying on top of the slushy snow near the car. Dawdy left his car at Christians's request and was placed under arrest. When the trooper tried to handcuff him, however, he resisted, and during the ensuing scuffle, he threw away the key that he had dropped earlier. A search of his person revealed a large wad of cash, and a search of the interior of the vehicle revealed a small scale. Dawdy's passenger was also arrested. Iowa State Trooper Eral and Sioux City Police Office Mark Skaff then began an inventory search of the car. When they realized that the trunk key was missing, they searched the area and found the key that Dawdy had thrown away. In the trunk, Eral and Skaff found more white powder. Both the powder in the black leather pouch and

the powder in the trunk field tested positive as an amphetamine.

After Dawdy was charged with possession of methamphetamine with intent to distribute, he filed a motion to suppress all evidence obtained as a result of the investigative stop and the arrest. The magistrate's report recommended that this motion be denied. The district court, however, ordered the suppression of all evidence resulting from the stop, with the exception of the black pouch found on top of the snow near the car. The district court subsequently denied the government's motion for reconsideration. The government now appeals the denial of its motion and the suppression of evidence.

## II.

■ The government argues that the investigative stop that resulted in Dawdy's arrest was supported by a reasonable suspicion under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We review the district court's findings of fact for clear error and review the ultimate conclusion of whether the stop violated the Fourth Amendment de novo. *United States v. Garcia,* 23 F.3d 1331, 1334 (8th Cir.1994), *citing United States v. Hernandez,* 854 F.2d 295, 297 (8th Cir.1988).

■ For a *Terry* stop to be considered valid from its inception, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted). Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence. *See Losee v. Dearinger,* 911 F.2d 48 (8th Cir.1990) (in which defendants, who were parked illegally behind a business which was closed and near an alley which had been used as an escape route for past robberies, attempted to avoid police); *United States v. Briggman,* 931 F.2d 705 (11th Cir.1991) (in which defendant, who was parked at 4:00 am in a high crime area in a lot adjacent to businesses which were

closed for the night, attempted to evade the investigating officer). Christians observed Dawdy and his passenger parked after 10:00 pm on a Sunday night at the back of the otherwise deserted pharmacy parking lot and at some distance from the surrounding residences. The trooper reasonably believed that the pharmacy was closed, and remembered the previous burglary alarms. When the squad car entered the parking lot, Dawdy started his car and attempted to leave. Even after Christians got out of the squad car and held up his hand, Dawdy attempted to turn his car around in order to avoid contact with the state trooper. The totality of these circumstances, not merely the presence of two men sitting in a parked automobile at night, was sufficient to lead a trained law enforcement officer rationally to suspect that a crime was being committed and to justify the initial stop.

■ A valid *Terry* stop must also be " 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Terry v. Ohio*, 392 U.S. at 19, 88 S.Ct. at 1878, *citing Warden v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1651–52, 18 L.Ed.2d 782 (1967) (Mr. Justice Fortas, concurring). Christians's initial stop of Dawdy involved a request for identification and an explanation of his presence in the parking lot, actions which we described in *United States v. Abokhai* as "minimally intrusive." 829 F.2d 666, 671 (8th Cir.1987). Only after Dawdy gave Christians conflicting answers did the officer run a warrant check on the driver's licenses of Dawdy and his passenger. Although Dawdy appeared nervous and opened his car door several times while Christians waited for the results of the warrant checks, Christians took no further action with respect to Dawdy or his passenger until a fellow officer arrived and discovered the black pouch containing methamphetamine. Thus the scope of the investigative stop did not exceed Christians's reasonable suspicion of criminal activity.

discovery of the black pouch containing the initially unidentified white powder. The district court correctly reasoned that the seizure of the pouch by the police did not violate the Fourth Amendment, as Dawdy had no legitimate expectation of privacy in the surface of the pavement near his car. The location of the pouch near the car did, however, establish a nexus between the pouch and Dawdy. The pouch had apparently fallen to the ground only a short time earlier, since it lay on top of the slushy snow near the car, and both the open car window and Dawdy's repeated attempts to leave the car during the warrant check allowed opportunities for him to drop the pouch. In addition, Christians had just observed Dawdy drop a key to the ground from the open window. Although the officers did not ascertain the identity of the white powder in the pouch before arresting Dawdy, the probable cause standard was met by the existence of a "practical, nontechnical" probability that criminal evidence was involved. *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983), citing *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949). The arrest itself justified the search of Dawdy's person, *United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 476–77, 38 L.Ed.2d 427 (1973), and of the passenger compartment of his automobile, *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). Because probable cause justified the search of the lawfully stopped vehicle, moreover, it also justified the search of "every part of the vehicle and its contents that may conceal the object of the search," including the trunk. *United States v. Ross*, 456 U.S. 798, 825, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982). Dawdy's arrest and the subsequent discovery of a large wad of cash in his pocket, a small scale in the glove compartment, and additional methamphetamine in the trunk of his car did not violate the Fourth Amendment, and the evidence may be fairly presented at trial.

### III.

■ The government further argues that Dawdy's arrest and the subsequent search of his vehicle were justified by the

### IV.

■ As an additional justification for Dawdy's arrest, the government notes that several courts consider resistance to even an ille-

gal arrest to be grounds for a second, legitimate arrest. *See United States v. Nooks,* 446 F.2d 1283, 1288 (5th Cir.1971) (holding that where the nexus between the original arrest and search had been attenuated by the defendant's attempt to flee, the fruits of the search were not attributable to the original arrest), *cert. denied* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261; *United States v. Garcia,* 516 F.2d 318, 319–20 (9th Cir.1975) (holding that neither illegal conduct on the part of the police nor the common-law right to resist an unlawful arrest excluded defendant's flight from police from consideration as the basis for a lawful arrest); *United States v. Waupekenay,* 973 F.2d 1533, 1538 (10th Cir.1992) (holding that evidence of a separate, independent crime initiated against police officers in their presence after an illegal entry or arrest will not be suppressed under the Fourth Amendment); *United States v. Bailey,* 691 F.2d 1009, 1019 (11th Cir.1982) (holding that despite a close causal nexus between an allegedly illegal arrest and the defendant's response, that response provided probable cause for a second, lawful arrest), *cert. denied,* 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). Although the Eighth Circuit has not previously addressed this precise issue, we now hold that a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest.

 In determining whether Dawdy's struggle with the state trooper provided such independent grounds for arrest, the dissent would have us consider the state trooper's subjective motivation for making the arrest. The standard for assessing probable cause, however, has long been an objective one. Traffic stops, for example, are measured by a standard of "objective reasonableness." *United States v. Miller,* 20 F.3d 926 (8th Cir.1994) (citations omitted). Chief Justice Marshall noted that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation, and in all cases of seizure, has a fixed and well-known meaning." *Locke v. United States,* 11 U.S. (7 Cranch) 339, 348, 3 L.Ed. 364 (1813). Probable cause for arrest or for search and seizure exists where the circumstances are "sufficient in themselves

to warrant a man of reasonable caution in the belief" that criminal activity is in progress or has occurred. *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). These conditions "are not technical, they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), *citing Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949). The struggle that ensued when the state trooper attempted to handcuff Dawdy, though quickly suppressed, would provide a reasonable police officer with probable cause for an arrest under Iowa law. *See* Iowa Code Ann. § 804.12 (West 1994) (stating that a person is not authorized to use force to resist an arrest ... even if the person believes that the arrest is unlawful or the arrest is in fact unlawful). Drawing again on the analogy to traffic stops, "we see no reason for requiring an officer's state of mind to perfectly match his legitimate actions." *United States v. Cummins,* 920 F.2d 498, 501, *cert. denied* 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448, 449 (1991). Thus, assuming *arguendo* that Christians's initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible.

## V.

For the foregoing reasons, we reverse the order of the district court suppressing the evidence against Dawdy and remand this case for trial.

LAY, Senior Circuit Judge, dissenting.

I respectfully dissent.

There have been powerful hydraulic pressures throughout our history that bear heavily on the Court to water down constitutional guarantees and give the police the upper hand. That hydraulic pressure has probably never been greater than it is today.

*Terry v. Ohio*, 392 U.S. 1, 39, 88 S.Ct. 1868, 1889, 20 L.Ed.2d 889 (1968) (Douglas, J., dissenting).

## I.

This Court has now, for the first time in this or any other circuit, determined that the police can seize, detain, and question an individual (or individuals) knowing nothing more than the fact that the person's car is parked legally in a mixed commercial/residential area at night.[1] There are simply no articulable facts of criminal activity in this case that justify the seizure made.

Clearly, police need to have the tools to investigate criminal conduct. Under the Fourth Amendment, however, a bright line exists between the intrusive seizure of citizens and need to make a criminal investigation. The Supreme Court first declared in *Terry, supra,* that an officer must have articulable and reasonable suspicion of wrongdoing before making an investigative stop. 392 U.S. at 21–22, 88 S.Ct. at 1879–81. In *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981), the Court restated this standard as follows: "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." 449 U.S. at 417–18, 101 S.Ct. at 695. This principle requires the presence of two elements before a stop is permissible. First, the officer's assessment of the situation must be objectively based on all of the circumstances. *Id.* at 418, 101 S.Ct. at 695. Second, this assessment of the whole picture "must raise a suspicion that the particular individual being stopped is engaged in wrongdoing." *Id.*

In other words, the Fourth Amendment requires an officer have more than an "inchoate and unparticularized suspicion" or "hunch" that an individual is involved in criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883).

The district court's factual findings in this case, which remain uncontested in this appeal,[2] demonstrate Officer Christians acted on no more than an unparticularized suspicion or hunch that any individual in the car was engaged in wrongdoing.[3] As an initial matter, the majority's recitation of facts often contradicts or misstates the district court's uncontested findings.

The majority states that Officer Christians observed Dawdy's vehicle parked at 10:00 on a Sunday night in an "otherwise deserted pharmacy parking lot and at some distance from surrounding residences." In fact, the district court specifically rejected the Government's assertion that this was strictly a commercial parking area. Rather, the Court found this lot was used for both commercial and residential purposes, and Dawdy's car was parked "about as close in proximity to [a] residence as it was to the Greenville Pharmacy." *United States v. Dawdy*, No. 93–4002 at 9 (N.D.Iowa Feb. 23, 1994) (order granting motion to suppress).

The district court stated that Christians had responded to a number of false burglar alarms at the pharmacy, the most recent of which was several months before this incident. *Id.* at 2, 23. The salient fact, which the majority does not mention, is that the officer had absolutely no knowledge whatso-

---

**1.** That the parking lot was located in a mixed commercial/residential neighborhood and was used for both commercial and residential purposes is one of the critical factual findings the majority omits in its analysis. As discussed in note 2, *infra*, these findings are uncontested by the Government and therefore should not be questioned by this Court.

**2.** Although the Government objects to a number of the district court's legal conclusions, it does not challenge the lower court's factual findings. Thus, the court's factual determinations should not be disturbed on this appeal. Even if the Government had challenged these findings, we would review them under the clearly erroneous standard. *United States v. Garner*, 907 F.2d 60, 61 (8th Cir.1990), *cert. denied*, 498 U.S. 1068, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991). There is nothing in the record, the Government's brief, or the majority's opinion which indicates the district court clearly erred in making its factual findings. Again, however, we need not reach this question because it is not before us.

**3.** Officer Christians admitted that when he stopped the car, he did not suspect any of the occupants of any particular crime. Transcript of Suppression Hearing at 101–2.

ever of any recent burglary of the pharmacy.[4]

The majority also points to what happened when the squad car pulled into the lot. Specifically, it states that "Dawdy started his car and attempted to leave," and, after Christians exited the squad car and held up his hand, "Dawdy attempted to turn his car around in order to avoid contact with the state trooper." The majority fails to mention, however, that the district court rejected the idea that Dawdy was simply trying to flee the area once he saw the squad car. Rather, the court made the factual determination that "when the Trooper originally entered the north entrance of the parking lot, the defendants were driving out in the direction of the Trooper, who was blocking the north entrance. It was only after defendants could not get through the north entrance that they backed up and began to head out the other direction." (citation omitted). *Dawdy*, No. 93–4002 at 11–12.

Taking these now uncontested factual findings into account, combined with others, the district court provided the following, thoughtful legal analysis:

> The officer had no articulable suspicion that a law had been or was being violated. This area is not classified as a "high crime" area. In fact, as has been found by this court, it is at least partially a residential area and the parking lot the defendants were parked in was used by the people in the house located 40 feet from the pharmacy. The officer only observed the vehicle for 2 to 4 seconds before determining that he would approach and investigate.... [A] lone automobile parked in a parking lot with the lights off at 10:00 at night is not sufficient articulable suspicion to justify stopping it. Furthermore, the fact that the vehicle attempted to leave does not warrant a stop, particularly in light of the fact that the vehicle first attempted to leave from the same exit that the officer

was blocking. This certainly does not indicate that the people in the vehicle are trying to avoid or flee the officer.

> Trooper Christians testified in this case that he was "curious" and was "suspicious" because of the location of the car. In addition, the Trooper testified that when he ran the warrant checks on the two individuals, he did not suspect them of any particular crime. The Trooper had observed no violations of the law, had received no reports of any criminal or suspicious activity in the area, had received no reports of burglar alarms at the pharmacy and really had no reason to stop the vehicle except for the fact that it was parked behind a pharmacy with the lights off. As previously stated, these facts, as a matter of law, do not justify the Fourth and Fourteenth Amendment intrusions.

*Id.* at 23–4 (citations omitted). Surely Christians' knowledge of past, *false* burglar alarms did not support his initial stop of Dawdy's vehicle. These remote and inconsequential events created no reasonable, articulable suspicion that the individuals in the car, parked halfway between the pharmacy and a residence, were violating or intending to violate the law in any way.

The majority's decision, which abandons the district court's well-reasoned analysis and holds one can be temporarily seized for sitting in a parked automobile at night, violates Supreme Court precedent; the decisions of our circuit, and the Fourth Amendment jurisprudence of the other circuits. As discussed, *supra*, the Supreme Court's decisions in *Terry, Cortez,* and *Sokolow* require more than just a generalized suspicion or hunch to support a seizure. Christians' actions, by his own admission, were based on mere curiosity and unparticularized suspicion. He could point to no articulable facts which would reasonably lead him to conclude the individuals in Dawdy's vehicle were engaged in wrongdoing. Furthermore, in *United States*

---

4. In fact, in its later discussion of the scope of Christians' search, the district court doubted whether Christians ever really suspected burglary. The court stated:

> [I]t is somewhat perplexing that the Trooper did not check the building for any signs of attempted entry, did not question the individu-

als about his suspicions and did not have the backup officers check the area for any signs of burglary. Further, the officer did not check with the local police for any reports of burglar alarms.

*Dawdy*, No. 93–4002 at 26.

*v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Court approved the right of a police officer to stop and question citizens in seeking their cooperation, along with the reciprocal right of the citizens to walk away if they so choose. In announcing this principle, however, the Court distinctly pointed out that stops of automobiles are "materially more intrusive" than questions put to pedestrians, and therefore the same rule does not apply in this context. *See id.* at 556–57, 100 S.Ct. at 1878–79. Today's decision, which allows an officer to approach nearly any occupied vehicle parked at night, functionally erodes this principle.

The majority's rationale also runs afoul of *Thompson v. Reuting,* 968 F.2d 756 (8th Cir.1992), this Circuit's most recent and most closely analogous "parked car" case. In *Thompson,* Police Officer Hale received a radio dispatch of a suspicious vehicle in a certain location. 968 F.2d at 759. It was dark when Hale received the dispatch, and he proceeded to the location and saw that a Chevy Nova was the only vehicle in the vicinity. *Id.* This area was known for having little traffic. *Id.* Furthermore, Hale was an experienced police officer and lived in the neighborhood in question, which he knew to be a "high-crime area." *Id.* Finally, from outside the Nova, he could not tell the race, sex, or number of occupants in the vehicle. *Id.*

As the Nova began to move away, Hale turned around and followed it. *Id.* at 758. After five blocks, although he did not see any violations of the law, Hale flashed his lights and pulled the car over. *Id.* He then called in a license-plate check, but received no reports. *Id.* Shortly thereafter, he approached to investigate, and as a result, ultimately arrested one of the occupants. *Id.*

In the context of a suit under 42 U.S.C. § 1983, this Court had to determine whether the officer's seizure of the vehicle was valid under the Fourth Amendment. *Id.* at 759. In concluding it was not because the officer lacked articulable and reasonable suspicion, this Court stated:

> All of the information available to Officer Hale was inchoate and unparticularized. He did not see any violations of the law. Facts such as being in a high-crime area, in the dark, and unable to see the occupants of the car are very general and provide no information about the people in the Nova, much less information indicating that the people may have committed a crime. The additional information provided by the dispatch does not make up the difference. A report that a particular car is "suspicious" simply does not indicate whether its occupants may be engaged in criminal activity.

*Id.* at 759–60.

Like Officer Hale, Christians merely saw a lone, occupied vehicle parked in the dark that he considered suspicious. He had no information concerning who was inside, nor any information whether the occupants had been engaged in wrongdoing. In addition, the mere fact that Dawdy's vehicle began to move as the squad car drew near, as did the vehicle in *Thompson,* provides no particularized information regarding its occupants or their activities. Thus, under *Thompson,* Christians' seizure of Dawdy's vehicle is a clear violation of the Fourth Amendment.[5] In other, analogous "parked car" cases, panels in this and other circuits have uniformly reached the same conclusion.[6]

---

5. In fact, Christians' actions were perhaps even less justified than those of Hale, because in *Thompson,* it was undisputed that the Nova was located in a "high-crime area," and Hale was found to be an experienced police officer. *See* 968 F.2d at 759. Here however, the district court specifically found that Dawdy's car was not parked in a "high-crime area" and that Christians was a relatively inexperienced officer who had been on the job for only four years.

6. *See, e.g., United States v. Packer,* 15 F.3d 654, 659 (7th Cir.1994) (holding that an anonymous tip reporting a suspicious vehicle containing four African–American men, parked at 1:00 a.m. along a street is insufficient to justify a *Terry* stop); *United States v. Jefferson,* 906 F.2d 346, 348 n. 3 (8th Cir.1990) (concluding that a state trooper did not have a reasonable basis for suspicion when he approached to investigate an occupied rental car with out-of-state license plates that was parked in a rest area at 6:40 a.m.); *United States v. Thompson,* 712 F.2d 1356, 1361 (11th Cir.1983) (stating an officer's noticing for the first time a person sitting in a vehicle parked in a short term parking lot for two weeks was insufficient to support a reasonable suspicion of criminal activity); *United States v. Beck,* 602 F.2d 726,

Furthermore, the majority's reliance on *Losee v. Dearinger*, 911 F.2d 48 (8th Cir. 1990), and *United States v. Briggman*, 931 F.2d 705 (11th Cir.), *cert. denied*, 502 U.S. 938, 112 S.Ct. 370, 116 L.Ed.2d 322 (1991), is misplaced.[7] There is nothing in the record in this case that indicates Christians was on anything more than a "fishing expedition." For this reason, the district court's decision to suppress evidence found as a result of Christians' initial seizure of Dawdy's car should be affirmed.

## II.

In its alternative holding, the majority urges that we should disregard what actually happened and instead apply an objective standard to consider what could have happened. Thus, the majority would disregard the officer's statement that he arrested Dawdy for wrongful possession of drugs and searched the car as an incident to that arrest.

With all due respect, under the facts and circumstances existing here, application of an objective standard—insisting that a reasonable officer would have probable cause to lawfully arrest Dawdy for resistance of arrest—does not serve to attenuate the search and separate the taint of the wrongful seizure.[8]

The majority indicates it is making new law in this circuit following the lead of four other courts of appeals. However, the cases relied upon do not create new law, they simply apply the traditional rules governing the doctrine of attenuation to purge the taint of the original wrongful arrest. This test has been the law of the land since the time of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).[9] *Wong Sun* and the doctrine of attenuation have long been applied in various contexts in this circuit.

Under *Wong Sun* and the test for attenuation, it is clear that the cases upon which the

729 (5th Cir.1979) (finding officers lacked articulable, reasonable suspicion when they detained for questioning two African–American men sitting in a parked car merely because the car's engine was running and the officers, who knew almost everyone who lived in the community, did not recognize the men as being from the neighborhood).

7. In *Losee*, this Court upheld a police officer's investigative seizure of a parked car, which was initially parked *illegally* in an alley which had been used as an escape route for an *actual robbery* of a nearby convenience store. 911 F.2d at 49–50. Moreover, the car sped away when the squad car approached, but later *returned* and pulled into the parking lot of the closed convenience store. *Id.* at 50. These facts are clearly distinguishable from the instant context, in which Dawdy's vehicle was parked *legally*, in a lot used for commercial *and* residential purposes, where there had been no recent history of actual criminal activity. In addition, Dawdy's vehicle did not "take off" and subsequently return. Thus, while the series of events in *Losee* could have led the officers in that case to reasonably believe the car's occupants were about to rob the convenience store, none of the circumstances which supported that particularized inference were present here. *Losee* therefore provides no basis for today's decision.

*Briggman* is equally inapposite. There the car in question was parked in a *commercial* parking lot, at 4:00 a.m., surrounded by closed businesses in which robberies and larcenies had *recently* occurred. *Briggman*, 931 F.2d at 707. In his previous patrols, the experienced twenty-one

year police veteran who spotted the vehicle had never seen an occupied vehicle in that commercial lot at that time of night. *Id.* When the car left the area the officer pulled it over to investigate. *Id.* In finding the officer's seizure valid, the Eleventh Circuit focused on the experience of the officer, the fact the car was parked at 4:00 a.m. in a high-crime area, and the fact the businesses the lot served were closed for the night. *Id.* at 709. These circumstances were not present in this case. The district court made specific and now uncontested factual findings that Christians was *not* an experienced officer, and that the lot in question was *not* located in a "high-crime area." Furthermore, the court also repeatedly emphasized the lot served *both* commercial and residential establishments, and for that reason, it was *not* uncommon for a car to be present in the lot at 10:00 p.m. Thus, the critical facts that supported the *Briggman* decision simply are not present here.

8. Under this alternative theory, the majority *assumes* that the initial stop of the automobile and the seizure of its occupants was effected without any reasonable articulable suspicion of criminal activity.

9. In *Wong Sun*, the Court explained the doctrine of attenuation and stated the correct question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has come at by exploitation of that illegality or by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417 (quoting Maguire, *Evidence of Guilt*, 221 (1959)).

majority relies are inapplicable to the circumstances governing this case. In each of these cases, after the illegal conduct of the officers, the defendants either fled at high rates of speed (*e.g.*, 115 m.p.h.), physically assaulted the officers, or shot at the officers. *See United States v. Waupekenay*, 973 F.2d 1533 (10th Cir.1992) (holding that although the entry by the police into the defendant's trailer to remove him was unlawful, after the defendant physically *assaulted* the officers with a *dangerous weapon* and was placed under arrest for that assault, evidence obtained from the premises was no longer tainted); *United States v. Bailey*, 691 F.2d 1009 (11th Cir.1982) (relying on *Wong Sun*, the court concluded that while the initial detention of the defendant may have been unlawful, once the defendant *fled* and then physically *assaulted* the arresting agent, the subsequent searches which uncovered illicit drugs were valid as incident to the "second, lawful arrest" that *followed* ), *cert. denied*, 461 U.S. 933, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983); *United States v. Garcia*, 516 F.2d 318 (9th Cir.) (finding, after assuming the fixed border patrol checkpoint at which the defendant was stopped to be illegal, that defendant's *high-speed escape* led to a *subsequent, lawful arrest* which supported the later search), *cert. denied*, 423 U.S. 934, 96 S.Ct. 290, 46 L.Ed.2d 265 (1975); *United States v. Nooks*, 446 F.2d 1283 (5th Cir.) (holding that the legality of the defendant's first arrest became academic after he committed the subsequent criminal acts of *fleeing at 115 m.p.h.* and *fired three shots directly at the sheriff*, which thereby justified a lawful arrest and the ultimate search of the automobile), *cert. denied*, 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971). The intervening action of the defendant in each case was clearly distinct from the illegal conduct of the officers in terms of temporal proximity, and obviously broke the causal chain of events.[10]

The circumstances in the instant case are decisively different than the incidents described above. The district court merely found there was evidence presented that Dawdy briefly struggled with the officers at the time he was being handcuffed. In addition, the arresting officer testified at the suppression hearing that he only informed Dawdy that he was under arrest for possession.[11]

The majority now relies on an objective analysis of probable cause to change what really happened in this case to what could have happened. Through such reasoning, they create a fictional account of what a reasonable officer might have done under similar circumstances. In so doing, they attempt to hypothecate an attenuating event to justify the subsequent search. With all due respect, the majority's analysis leads nowhere; the fact that probable cause is to be judged objectively does not transform Dawdy's momentary scuffle into an attenuating event sufficient to purge the taint of the original illegal stop and the subsequent search.

Under the facts existing here, there was no time lapse to temporally separate Dawdy's resistance and the subsequent search from the illegal stop and tainted arrest. Moreover, Dawdy's resistance was not a sufficient "intervening circumstance" to break the causal chain that lead to the subsequent search. The record is clear that as the officer was placing handcuffs on Dawdy to make the illegal arrest, there was a momentary scuffle. However, the officers immediately completed their initial act of handcuffing Dawdy, completed the arrest for possession of drugs, and proceeded to search the vehicle for drugs. Dawdy's brief resistance was clearly not a distinct, attenuating event separating the wrongful seizure from the search. Rather, it was part of a brief, continuous encounter between the officers and Dawdy that began with an unlawful seizure and resulted shortly thereafter in the wrongful search for drugs in Dawdy's vehicle. Any

10. *See, e.g., Dunaway v. New York*, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), setting forth the traditional tests applicable to the rules of attenuation.

11. Although Dawdy was later charged with resisting arrest (the charge was later dismissed), he was not arrested for that crime at the scene.

attempt to assert that the search was based on a totally new and independent ground for arrest is clearly theoretical. The doctrine of attenuation does not rest on what could have happened, but what in fact did happen. Thus, even if we are able to hypothesize that the officers objectively had probable cause to arrest Dawdy for his resistance, the evidence seized in this search nevertheless clearly constituted the fruit of the illegal *Terry* stop. There is little doubt that this evidence was obtained by "exploitation" of the wrongful stop and seizure. *See, e.g., Wong Sun,* 371 U.S. at 487–88, 83 S.Ct. at 417–18.

Under the majority's analysis, every illegal seizure can now be considered attenuated from an ensuing illegal search if the arrestee even flinches or makes a perky movement of hesitation or resistance to his illegal seizure. This reduces the *Terry* doctrine and the Fourth Amendment to a meaningless shamble. It is difficult for me to understand why it is necessary for courts to stretch the rules governing arrests to the ends of legal credulity to circumvent constitutional principles.

### III.

In conclusion, the majority's misreading of the facts in this case and its misapplication of the law have produced a result that is unquestionably contrary to established precedent. More disturbingly however, today's decision is but another example of the erosion of constitutional guarantees that protect our liberties and shield *all of us* from intrusive official seizures.