# IN THE COURT OF APPEALS OF IOWA

No. 15-0179
Filed February 10, 2016


**BRUCE PATRICK SAMSARA,**
     Plaintiff-Appellant,

**vs.**

**SERGEANT DALE SQUIRES, in His Official Capacity and Individually, and
SERGEANT MARK KUKUZKE, in His Official Capacity and Individually,**
     Defendant-Appellees,

and

CITY OF FAIRFIELD, and FAIRFIELD POLICE DEPARTMENT,
     Defendants.
_____


        Appeal from the Iowa District Court for Jefferson County, Daniel P. Wilson,

Judge.


        Bruce Samsara appeals from the district court's ruling granting summary

judgment in favor of the individual defendants.    **AFFIRMED IN PART,**

**REVERSED IN PART, AND REMANDED.**


        Joseph Glazebrook of Glazebrook, Moe, Johnston, & Hurd, L.L.P., Des

Moines, for appellant.

        David E. Schrock of Scheldrup Blades, Cedar Rapids, for appellees.


        Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Bruce Samsara appeals from the district court's ruling granting summary judgment in favor of the individual defendants. He argues that the district court incorrectly determined no genuine issue of material fact existed as to whether his arrest was supported by probable cause, erred in granting qualified immunity to the defendant officers on his false arrest and excessive force claims, and erred in dismissing his entire petition at law even though the defendants' motion for summary judgment was denied in part. We find the district court appropriately granted partial summary judgment to the individual defendants, but agree with Samsara that the district court should not have dismissed his entire petition at law based upon a partial grant of summary judgment, and therefore reverse the district court's order in part and remand the case for further proceedings.

## I. Background Facts and Proceedings

At approximately 6:00 p.m. on January 15, 2011, police officers in Fairfield, Iowa, received a report of a burglary at a local business in the town's square. A witness to the incident was able to identify one suspect for the police—Zachary Burke. Burke was said to have fled northbound from the scene on foot wearing a black hooded sweatshirt. This information was relayed to Sergeant Dale Squires, who was on duty in his squad car at the time. Squires was also informed that Burke was "a short kid about fourteen, brown hair, maybe thirteen," and that he lived on West Burlington Avenue, approximately eight blocks west of the town square. The description given for Burke was accurate— Burke was a five-foot-two-inch, ninety-three-pound, twelve-year-old boy—but

also largely unnecessary, because Squires was already familiar with Burke from prior contact with him. Precisely what transpired next is disputed.

### A. Squires's Account

Sergeant Squires testified at his deposition that when he received the report identifying Burke, he recalled having just seen a person walking westbound between the town square and Burke's home. He also recalled the person being a thin, white male wearing dark clothing and a hooded sweatshirt. Squires admitted that he thought from the outset that the person he had seen "might be too tall to be [Burke]," but explained that he was not sure because "teenagers grow like weeds, and it's kind of hard to estimate height from a passing squad car." He explained that he only wanted to locate the youth so he could determine whether it was Burke. Squires quickly found the person, who was still walking westbound on West Burlington Avenue between the town square and Burke's home. It was not twelve-year-old, five-foot-two-inch Burke. It was instead forty-four-year-old, six-foot-plus Bruce Samsara.

According to Squires, Samsara was wearing a dark hooded sweatshirt with the hood up so that his face was obscured from view as Squires approached in his squad car. Squires testified that he called out to Samsara several times to stop walking and come over to the squad car, but Samsara kept walking. Having received no response, Squires got out of his squad car and ordered Samsara to come over to him. By then, Samsara had walked far enough west that he was approximately two blocks past Burke's home. When Samsara finally stopped walking, he was still approximately fifteen feet away from Squires and was facing in the opposite direction. Squires recalled that after Samsara stopped

walking, he raised his left hand straight in the air but kept his right hand in his pocket. In his raised left hand, Samsara clutched an unknown object, which turned out to be a microcassette tape recorder. Squires approached Samsara from behind in order to speak with him, and he testified at his deposition regarding his state of mind as he did so:

> I'm a little concerned. I could tell the object in his hand isn't a cell phone because it's too big, but I don't know what it is. It had a glowing red light on it. I don't mean to sound paranoid, but worst case scenario, I was afraid it would be some kind of improvised explosive device because I had no idea. Also he kept his right hand jammed in his pocket, and I was afraid he might have a weapon in his hand.

Squires explained that as he got closer, he was able to see Samsara's face and could tell that he was not Burke. But he did not allow Samsara to go on his way. Squires wanted to conduct a protective pat down to make sure Samsara was not armed with a weapon, and Squires had begun to believe Samsara might be intoxicated based upon his odd behavior. Squires still did not know who Samsara was, so he asked him to either identify himself or show identification. Samsara did not comply. Another Fairfield police officer, Sergeant Mark Kukuzke, arrived at the scene and also asked Samsara to identify himself. Samsara still did not comply.

Squires testified that he tried to pat Samsara down multiple times but was unable to do so because Samsara would pull away. Squires grabbed Samsara's coat in order to stop him from walking away, and began to walk him to the squad car. Squires considered the attempts to pull away to be "belligerent and combative" behavior, and decided that he wanted to handcuff Samsara for safety purposes because the officers still did not know who he was or whether he had

any weapons. But when he tried to handcuff Samsara, Samsara "began to try to pull away" from him once again, so Squires and Kukuzke took him to the ground.

According to Squires, he and Kukuzke took Samsara down to the ground face up and then tried to roll him over onto his stomach for handcuffing. However, before they were able to do so, Samsara kicked upward while still lying on his back, striking Squires in the chest with the sole of his shoe. Squires believed the kick was intentional, and advised Samsara that he was under arrest for assault on a peace officer. The two officers were able to subdue Samsara and handcuff him. After Samsara was arrested, he was placed in Squires's squad car and transported from the scene.

## B. Kukuzke's Account

Sergeant Kukuzke's account is substantially similar to Squires's, albeit from a different vantage point. According to Kukuzke, Squires and Samsara were already talking on the sidewalk when he pulled up and he intended to watch and make sure Squires was okay during the stop. Kukuzke was not on duty at the time and had no idea about either the burglary that had occurred or Squires's reasons for having come into contact with Samsara. He remained in his vehicle until the conversation seemed to get more heated, and then got out to assist when Samsara pointed his finger at Squires.

Once Kukuzke got out of his car, he could hear Squires asking Samsara for identification and Samsara refusing to comply and wanting to leave. Kukuzke told Samsara he needed to identify himself to Squires. He recalls Samsara keeping one hand in his pocket and holding up an object in the other. He agrees that he and Squires escorted Samsara back over to Squires's squad car, and

that the two grabbed Samsara after he tried to walk away. Kukuzke stated at his deposition that he believed Samsara was arrested for the charge of interference, based upon the fact that he was not cooperating with Squires's attempts to pat him down.

According to Kukuzke, once they were back at the squad car attempting to pat Samsara down, Samsara was "very belligerent to the point that he was basically out of control," so Kukuzke "swept his feet, got him flat on his back on the ground and stayed on his left arm while Officer Squires grabbed his right arm." At some point during this course of events, Kukuzke believed Samsara kicked Squires, although he did not see the kick because he was focused on getting the item out of Samsara's hand. Kukuzke was able to pry the item, which he now realized was a tape recorder, from Samsara's grip and tossed it away. He then helped Squires roll Samsara onto his stomach to be handcuffed.

### C. Samsara's Account

Samsara does not dispute the general contours of the account as told by Squires and Kukuzke, but does dispute various particulars. For example, Samsara testified at his deposition that he was not wearing any sort of hooded sweatshirt. He stated he left his home to walk to the grocery store wearing blue jeans and a dark blue jacket with a low collar. Also, according to Samsara, Squires was initially trying to engage in "light chitchat" with him. By Samsara's account, Squires only told him to stop once, at which point he raised both hands up in the air. He admits he was holding a tape recorder in his hand as he walked, but stated at his deposition that when he was ordered to stop he raised

his hands and held the tape recorder up specifically so the officers would be able to see what it was.

Samsara also testified that while it is true Squires and Kukuzke repeatedly asked to see his identification, he told them he did not have proper identification on his person. According to Samsara, the two officers never asked him to identify himself by name. He explained at his deposition that he became annoyed at Squires for stopping him for apparently no reason, and admitted saying to the officers, "You're the dumbest fucking people I've ever met." Samsara states he repeatedly told Squires he was on his way to get groceries, and that when Squires failed to explain his reasons for stopping and detaining him, he turned to leave and continue on his way. When he attempted to leave, both officers "attacked" him and "pounded [him] on the gravel."

Samsara recalled the officers throwing him down on the gravel very hard, and that he hurt his tailbone landing. He further recalled Squires elbowing him in his chin with his right elbow, drawing blood and chipping his teeth, and Kukuzke kneeing him in the back of the head. Samsara also denied the officers' accusation that he intentionally kicked Squires in the chest once on the ground:

> I didn't kick him in the chest. I can only imagine that if [he] got kicked in the chest, it's because my feet flew up in the air from being on the ice. If that's when they got kicked or if it's when I got kneed in the back of the head and they were tearing the tape recorder out of my hand and I was unconscious, so it would be a response from being hit in the back of the head really hard.

Samsara described the officers as being angry he was holding the tape recorder and recording everything, and recalled that after he had been thrown to the ground, Kukuzke ripped the tape recorder from his hand and threw it across

the parking lot. According to Samsara, the officers took his wallet out of his pants pocket at that point and then handcuffed him face down on the ground. He denies becoming belligerent, but admitted at his deposition that he was shouting, "[W]hat do you want from me?"

### D. Police Video Recording of the Incident

The testimony of the parties in this case is supplemented by a video recording of the incident. The video recording consists of two different views from inside Squires's squad car. The first view shows the front of the car from the dashboard. The second view shows the backseat area of the car from an angle behind the driver's seat. Squires testified that he turned on the patrol car's video camera when he got out of the car to confront Samsara. The video recording shows several things definitively, but cannot resolve most of the factual disputes both because it was turned on after Squires says he had already ordered Samsara to stop several times, and because most of the pertinent action takes place outside of the view of either camera.

When the recording begins, Kukuzke's personal vehicle is seen pulling across the front of the squad car. Squires and Samsara can be heard arguing off camera. Squires says, "Sir, you've done nothing wrong, except not . . ." but is interrupted by Samsara, who exclaims, "You're absolutely right, I haven't done anything wrong!" Samsara then appears to say "fuck you" to Squires, although the audio is not clear. At that point, Squires instructs Samsara to come to his squad car because he is going to have to identify himself. Sounds can be heard that may be Squires and/or Kukuzke making physical contact with Samsara. Kukuzke can be heard at that point telling Samsara, "You do have to identify

yourself. I am a police officer too. Identify yourself. Who are you sir?" The three argue back and forth, with Samsara yelling, "Don't touch me!" The officers accuse Samsara of resisting and interfering. Samsara denies he is doing so. The officers ask for identification and Samsara appears to say he does have identification with him (which contradicts his deposition testimony). During the exchange, Samsara is audibly upset, and is swearing at the officers. Among other things, Samsara says to the officers, "God damn you fucking idiots," and "You are the dumbest fucking people." An officer again tells Samsara to come over to the squad car. Squires can be heard remarking, "I don't understand what is going on here, all I wanted to do was talk to you."

At this point, two people are partially visible in the video, standing off to the passenger side of the hood of the squad car. Samsara is told to place his hands on the hood of the car and asked whether he has any weapons on him. A struggle then ensues. The struggle briefly takes place on camera but outside of the car's headlights, and then moves out of view. Sounds of the continuing struggle can be heard. Much of what is being said at this point is unclear, although Samsara can be heard telling the officers to get off of him. After more struggling and yelling back and forth, Squires says, "Okay, now you're under arrest for assault on a peace officer, 'cause you just kicked me." Samsara is handcuffed off camera, as the parties continue to argue. The officers place Samsara in the back seat of the squad car, at which point he is again visible on camera.

Squires can then be seen retrieving Samsara's tape recorder from the snow in front of the squad car. Kukuzke joins Squires in front of the squad car

and the two have a brief conversation. Squires thanks Kukuzke for his help, and Kukuzke asks, "What was that all about?" Squires replies,

> He matched the description of a subject that stole a purse, so I told him to stop like three times and he just kept on walking. I couldn't tell—when he turned around, I could tell it wasn't him—so I tried to explain. He wouldn't give me any information, tried to walk away from me.

Squires calls in the arrest, and reads Samsara his rights. Eventually, Squires drives to the police station, where Samsara is taken from the back seat and led through a door and out of view. Prior to that, however, Samsara is clearly visible in the video at several points in time. Samsara does not have a hood over his head or even appear to be wearing any kind of hooded clothing at all. Instead, he is wearing a jacket with a short collar zipped all the way up.

### E. District Court Proceedings

Samsara was charged with assault on a peace officer and interference with official acts. *See* Iowa Code §§ 708.1, 708.3A, 719.1 (2011). On June 23, 2011, the district court granted Samsara's motion to suppress evidence, ruling that "the officers did not have probable cause or reasonable suspicion for seizure of the defendant."

Samsara then filed a civil petition at law on January 15, 2013, alleging federal civil rights claims of false arrest and excessive force against Squires, Kukuzke, the City of Fairfield, and the Fairfield Police Department. The defendants filed a motion for summary judgment on November 5, 2014. The motion was granted in part by the district court on January 9, 2015.

By agreement of the parties, the City of Fairfield and the Fairfield Police Department were dismissed from the lawsuit. The district court's remaining

rulings, which are the only rulings now appealed, pertain to Squires and Kukuzke alone. The district court ruled Squires and Kukuzke were not entitled to summary judgment on the issue of whether there was reasonable suspicion to justify the initial investigatory stop of Samsara, but were entitled to summary judgment on the issues of whether probable cause existed for Samsara's arrest and whether the officers had qualified immunity for their use of force against Samsara. The district court concluded its written ruling by stating, "The Defendants' motion for summary judgment . . . is denied in part and granted in part as set forth above." The court then ordered, "[Plaintiff's] petition at law . . . and this cause of action are dismissed."

Samsara now appeals the district court's grant of partial summary judgment as to the individual defendants, as well as the dismissal of his entire petition at law when the defendants' motion for summary judgment was denied in part.

## II. Standard of Review

We review summary judgment rulings for correction of errors at law. *Baker v. City of Iowa City*, 867 N.W.2d 44, 51 (Iowa 2015). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3); *City of Fairfield v. Harper Drilling Co.*, 692 N.W.2d 681, 683 (Iowa 2005). "A fact is material if it will affect the outcome of the suit, given the applicable law." *Huck v. Wyeth, Inc.*, 850 N.W.2d 353, 362 (Iowa 2014). "An issue of fact is 'genuine' if the evidence is such that a reasonable finder of fact could return a verdict or decision for the nonmoving party." *Id.* In determining whether a genuine issue of

material fact exists, we view the evidence in the light most favorable to the nonmoving party. *Id.*

### III. Analysis

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In other words, the Fourth Amendment imposes a general standard of reasonableness upon all searches and seizures by government officials. *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). Reasonableness usually requires that a search or seizure be conducted pursuant to a warrant, and searches and seizures conducted without a warrant are per se unreasonable unless a recognized exception applies. *Id.*

One exception to the warrant requirement allows a police officer to stop an individual for investigatory purposes based upon a reasonable suspicion that a criminal act has occurred or is occurring. *State v. Kinkead*, 570 N.W.2d 97, 100 (Iowa 1997) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). The purpose of an investigatory stop is to allow the police officer to confirm or dispel suspicions of criminal activity through reasonable questioning. *Kreps*, 650 N.W.2d at 641. Despite its temporary nature and limited purpose, an investigatory stop still constitutes a seizure within the meaning of the Fourth Amendment. *Id.* Therefore, although such a stop falls within an exception to the general warrant requirement, it must be considered objectively reasonable under the circumstances in order to be deemed constitutional under the Fourth Amendment. *Id.*

In order to justify an investigatory stop, a police officer must be able to point to "specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* Reasonable suspicion of criminal activity, however, means just that. It requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and the evidence justifying the stop need not rise to the level of probable cause. *Id.* at 642. Whether an investigatory stop is justified by reasonable suspicion "must be determined in light of the totality of the circumstances confronting a police officer, including all information available to the officer at the time the decision to stop is made." *Id.*

Another exception to the general warrant requirement allows a police officer to arrest an individual based upon probable cause. *See State v. Christopher*, 757 N.W.2d 247, 250 (Iowa 2008). Probable cause to arrest exists "if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it." *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990). As is the case for investigatory stops and all other searches and seizures under the Fourth Amendment, the reasonableness of an arrest is judged against an objective standard, as opposed to a subjective one. *Terry*, 392 U.S. at 21–22 (stating that when evaluating the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?").

Police officers are entitled to use force during both investigatory stops and arrests. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). However, the use of force by police officers while conducting both types of seizure is subject to the same standard of reasonableness as the seizure it accompanies. *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985). A court considering the constitutionality of a seizure must balance "the extent of the intrusion against the need for it," meaning that reasonableness under the Fourth Amendment is determined in part by "how [a seizure] is carried out." *Id.* This balancing test limits the force used to that necessary to accomplish the goals of the seizure in context of the specific facts and circumstances of each particular case. *See State v. Dewitt*, 811 N.W.2d 460, 468 (Iowa 2012) (explaining although the amount of force necessary to accomplish the goals of an investigatory stop will vary depending on the facts and circumstances of the case, "a seizure justified by reasonable suspicion must be minimally intrusive").

The district court began its analysis with its conclusion that a genuine issue of material fact exists as to whether Squires's initial investigatory stop of Samsara was supported by reasonable suspicion he had been involved in criminal activity. This finding is not disputed on appeal.

### A. Probable Cause to Arrest

Samsara disputes the district court's finding regarding probable cause to arrest. On this issue, the district court's ruling recognized that Samsara "generally denies that he kicked Squires," but then found:

> The necessary material fact to determine whether Squires had probable cause to arrest Samsara is whether Squires believed the offense of assault had been committed by Samsara. Viewing the facts in the light most favorable to Samsara, in which there was clearly some physical interaction between Samsara and one or both officers, it is reasonable to believe that Squires believed he was intentionally kicked by Samsara, providing probable cause for arrest. Therefore, no genuine issue of material fact remains on the issue of probable cause to arrest and Defendants are entitled to summary judgment as a matter of law on this issue.

The district court was correct in finding Samsara's denial of intent to kick Squires does not diminish the officer's reasonable belief an assault had occurred. Samsara concedes his feet may have made contact with Squires's chest, and Squires's belief that the contact was intentional was objectively reasonable given the totality of the circumstances. The court correctly granted summary judgment to the officers on this issue.

Summary judgment in favor of Squires and Kukuzke on the issue of false arrest also was appropriate because Samasara committed a misdemeanor in the officers' presence by interfering with official acts. "[An individual's] response to even an invalid arrest or [investigatory] stop may constitute independent grounds for arrest." *United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995). The law in Iowa is that a person may not resist even an unlawful arrest by a known peace officer. Iowa Code § 804.12 ("A person is not authorized to use force to resist an arrest . . . even if the person believes that the arrest is unlawful or the arrest is in

fact unlawful."); *see also Dawdy*, 46 F.3d at 1431; State *v. Thomas*, 262 N.W.2d 607, 611 (Iowa 1978) (holding that "a person may not resist an arrest reasonably effected by one whom the arrestee knows or has good reason to know is a peace officer, despite the legality or illegality of the arrest"). Moreover, the law in Iowa makes it illegal for a person to "knowingly resist[ ] or obstruct[ ] anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer." Iowa Code § 719.1.

It is clear from the video recording of the underlying incident and the testimony of those involved that the officers were detaining Samsara at least in part so they could identify him and then pat him down for weapons. The video recording further establishes that Samsara interfered with and physically resisted the officers' attempts to identify and pat him down (although the degree to which he did so is unclear because most activity is only audible and not captured on screen). That video evidence, combined with Samsara's own testimony that he turned to walk away from the officers because Squires "ha[d] no purpose for detaining [him] there," establishes Squires and Kukuzke had probable cause to arrest him not only for assault, but also for interference with and resistance to an investigatory stop. Samsara's behavior defeats his false arrest claim.

## B. Qualified Immunity for Excessive Force

Samsara also disputes the district court's finding regarding the officers' use of force. The district court granted summary judgment to the officers on their claim of qualified immunity as to Samsara's count of excessive force.[1] The

---

[1] The district court also used the doctrine of qualified immunity as a secondary basis for granting summary judgment on the false arrest claim. Because we have already

analysis to determine whether qualified immunity applies is distinct from the analysis of whether excessive force was used. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), *modified by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that the two-step protocol set forth in *Saucier* "should no longer be regarded as mandatory," so a court may use its own judgment and consider either of the two steps first).

Qualified immunity operates to immunize police officers from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," and in doing so "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly." *Pearson*, 555 U.S. at 231. Whether a right is clearly established depends upon "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004). In other words, qualified immunity protects police officers from liability when a reasonable officer in their position would have believed their actions to be proper.

Here, the physical struggle is not disputed, but the video and audio fail to show whether the force was proportional to the situation facing the officers at the scene. Samsara claims he was "brutally taken to the ground, aggressively held

___

determined that the individual defendants were entitled to summary judgment on that claim, we need not address whether the doctrine of qualified immunity was properly applied in that context.

there, while he was handcuffed," and there is no question it took both officers to take Samsara to the ground and to handcuff him while disposing of the object in his hand. The question is whether the officers could have accomplished those tasks with less force and whether they reasonably knew the amount of force they used was unlawful. The evidence shows both officers made numerous attempts to bring Samsara to the squad car without force. Samsara resisted and fought against the officers' efforts. As for Samsara's claimed injuries, the summary judgment record reveals no evidence that he required or requested medical treatment and he appears to be unhurt in the video showing him in the back of the car.

In ruling that Squires and Kukuzke were entitled to qualified immunity on the excessive force claim, the district court wrote:

> In this case, while viewing the facts in the light most favorable to Samsara, the Court must determine whether it was clear to Squires and Kukuzke that their use of force was unlawful, given the circumstances with which they were presented. Samsara's excessive force claim arises from the physical interaction between Samsara, Squires, and Kukuzke. Samsara alleges that he 'was brutally taken to the ground, aggressively held there, while he was handcuffed by [Squires and Kukuzke].' . . . This is the point in the video recording when no one is shown on video, but there are sounds of a struggle between the three men. The physical struggle is not disputed by either party, and is obvious from the video and audio recording, presented a situation in which the officers' use of force was not unlawful, given the circumstances. They had confronted Samsara, who had previously been nonresponsive, then responded loudly, and finally had resisted an attempt to be patted down for the officers' safety. Squires's and Kukuzke's use of force in these circumstances was reasonable, and therefore lawful. Qualified immunity also applies to Samsara's claim of excessive force.

We agree with the district court that the officers were entitled to qualified immunity on the issue of force. The amount of force used by the officers is in

dispute, but the parties agree on the material facts of the forcible take-down. There is no material fact in dispute that would lead the officers to believe at the time, on the scene, that their use of force was unlawful. *Cf. Debower v. Bremer Cty.*, No. 09-1423, 2010 WL 2757112, at \*9 (Iowa Ct. App. July 14, 2010) ("Where, as here, facts material to the qualified immunity analysis remain in dispute, a jury question is generated and summary judgment is inappropriate."). Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right. *See Saucier*, 533 U.S. at 206. Furthermore, *Pearson* allows courts to consider whether an official could reasonably have believed his conduct was lawful without first analyzing whether the facts alleged make out a constitutional violation. 555 U.S. at 236.

Here, the relevant issue is the objective question whether a reasonable officer would have believed the officers' use of force to be lawful, "in light of clearly established law and the information the [arresting] officers possessed. [The officer's] subjective beliefs . . . are irrelevant." *See Leydens v. City of Des Moines*, 484 N.W.2d 594, 597 (Iowa 1992). The officers' actions here did not clearly violate the constitutional prohibition against excessive force. As a result, the district court correctly applied the qualified immunity doctrine to shield the officers from liability.

### C. The District Court's Dismissal of Samsara's Petition at Law

Having determined that the district court appropriately granted summary judgment to the individual defendants on the issues of probable cause to arrest and qualified immunity for excessive force, one final issue remains. Samsara

argues that even if the district court's rulings on summary judgment are upheld, we still must reverse the district court's order dismissing his entire petition at law. We agree. The district court's ruling ends by stating, "The Defendants' motion for summary judgment . . . is denied in part and granted in part as set forth above." A partial grant of summary judgment in favor of the defendants does not warrant the dismissal of a plaintiff's entire petition at law. There remains the issue of the legality of the investigatory stop.

We therefore affirm the district court's grant of summary judgment on the issues of probable cause to arrest and qualified immunity for excessive force, but reverse the district court's order dismissing Samsara's petition at law, and remand to the district court on the unresolved issue of the legality of the investigatory stop.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**