STATE of Iowa, Appellee,

v.

Eugene Luverne DAWDY, Appellant.

No. 94–455.

Supreme Court of Iowa.

June 21, 1995.

Paul M. Bengford and Stanley E. Munger of Munger & Reinschmidt, Sioux City, for appellant.

Thomas J. Miller, Atty. Gen., Thomas S. Tauber, Asst. Atty. Gen., Thomas S. Mullin, County Atty., and Mark A. Campbell, Asst. County Atty., for appellee.

Considered by LARSON, P.J., and CARTER, LAVORATO, NEUMAN, and ANDREASEN.

LAVORATO, Justice.

The defendant, Eugene Luverne Dawdy, appeals from his conviction for failure to affix drug tax stamps. He was convicted of possessing seven or more grams of a taxable substance without affixing the appropriate stamps. *See* Iowa Code § 421A.12 (1991). On appeal, Dawdy challenges the district court's ruling denying his motion to suppress contraband evidence officers seized after his car was stopped. Dawdy claims the officer who stopped his car had no reasonable and articulable suspicion of criminal activity justifying the stop. In the alternative, Dawdy asserts that even if the stop was valid, the officer's questions and actions were not reasonably related in scope to the circumstances that the officer claims justified the stop in the first place. Those circumstances were the officer's suspicion of burglary. Last, contrary to the State's contention, Dawdy insists that when he was placed under arrest he committed no assault that provided an

independent ground for the stop and the subsequent search.

We assume without deciding that the stop was invalid. Nevertheless, we conclude that Dawdy's assault provided an independent ground for his arrest and the subsequent search of his person and the passenger compartment of his car. Probable cause and exigent circumstances justified search of the car's trunk. The district court correctly denied Dawdy's motion to suppress the contraband evidence the officers seized during the search. We therefore affirm the district court's judgment of conviction and sentence.

■ Because Dawdy raises a constitutional question under the Fourth Amendment to the federal Constitution, our review is de novo. We resolve the question by making our own independent evaluation of the totality of the circumstances. *State v. McKnight,* 511 N.W.2d 389, 391 (Iowa 1994). Upon our de novo review we find the facts as follows.

The events giving rise to these proceedings occurred on Sunday evening, December 13, 1992, in the parking lot behind Greenville Pharmacy in Sioux City. Trooper Stuart Christians saw Dawdy's car in the back parking lot of the pharmacy near a dumpster and facing west. Christians noticed the car as he was driving by on the street, but only observed the car for two to four seconds. After Christians passed the car, he realized there were people in it and the car's lights were off. Christians could not tell if the car was running.

Christians knew the pharmacy was not open twenty-four hours a day and knew it usually was not open on Sunday nights. But he was not completely sure if the pharmacy was open that night. He also knew of several false burglary alarms at the pharmacy on other occasions.

The parking lot has two entrances. One is to the north and the other is to the south. Christians pulled into the north entrance and stopped his marked car there. When he did, Dawdy backed up his car and drove north in Christians' direction. Dawdy's action led Christians to believe that the car was about to leave.

Christians got out of his car and held up his hand for Dawdy to stop. At this point, Dawdy stopped and then backed westward so that the car was now facing northeasterly. Concerned that the car might exit the south entrance, Christians activated his flashing lights and Dawdy stopped.

Christians asked Dawdy what he was doing and Dawdy said he was turning around. Dawdy then told Christians that he was waiting in the parking lot for someone. The evidence revealed that Dawdy's ex-sister-in-law lives in a house across from the pharmacy.

Christians took driver's licenses from Dawdy and his passenger, David P. Pinney. Christians then asked the communications center to run a check on the two. The check showed there were no outstanding warrants for either Dawdy or Pinney.

While Christians was conferring with the communications center, he asked for assistance. Trooper Charles Gambell who was in the area heard Christians' conversation with the center, recognized the two names, and proceeded to the pharmacy.

While Christians was doing the check, Dawdy appeared to be nervous and jittery. Dawdy would open his door and close it.

About this time a pickup truck appeared on the scene. The truck was behind Christians. Concerned about his own safety, Christians told the driver of the pickup to leave and he did.

At this point, Christians contacted Woodbury County Deputy Sheriff Doug Boetger and asked him to come to the pharmacy with his dog. The dog was used to sniff drugs. Gambell arrived and entered the south entrance of the parking lot. Boetger also arrived with his dog. Boetger let the dog out but the dog did not sniff for drugs.

Gambell went to the passenger side to talk to Pinney while Christians talked with Dawdy. While Christians was talking with Dawdy, Dawdy dropped a key outside the door. Christians moved it with his foot and returned it to Dawdy.

While Gambell was at the passenger side, he saw a black pouch lying in the fresh snow. The pouch was near the right rear door of the vehicle. The pouch was not covered with

snow and appeared to have been recently placed or discarded there. Gambell picked the pouch up, laid it on the trunk of the car, and said "I found it."

The pouch contained a clear baggy protruding from it. The baggy contained a white powdery substance which Christians believed to be a controlled substance.

Christians asked Dawdy to step out of the car and told him he was placing him under arrest for possession of a controlled substance. Christians described what happened when he tried to place Dawdy under arrest:

Q. What did Mr. Dawdy do when you told him that [he was under arrest]? A. He exited his vehicle just as asked and I asked him to place his hands on top of his vehicle, both hands on the roof of the car and he did so also.

Q. At that point, what did you do? A. I reached for his left hand, and I was going to place it behind his back and put the handcuffs on.

Q. What did Mr. Dawdy do at that point? A. At that time, he turned around quickly and his right arm came across and struck my chest here (indicating). Not the fist portion, just his forearm and elbow struck across my chest.

Q. And at this point, what happened? A. Deputy Boetger was right there. He was grabbing at one arm. I still was trying to hold on to the left and we attempted to put the handcuffs on Mr. Dawdy.

Q. Were you able to do so at that point? A. Not directly at that point. There was a struggle to do so.

Q. And was Mr. Dawdy agreeing to be handcuffed at this point? A. No, sir.

Q. And how was Mr. Dawdy resisting being handcuffed? A. He was pulling his arms away and trying to thrash them about.

Q. And at times did Mr. Dawdy, in his thrashing, strike you or Deputy Boetger? A. I don't know about any contact with Deputy Boetger. I wasn't monitoring that. There was—he struck my person. Never too violently. I think at this point in time,

he was just trying to just get away, get his arms freed.

. . . .

Q. All right. At some point, did you have to go to the ground with Mr. Dawdy in an effort to restrain him? A. Yes, sir.

Q. And [did] Deputy Boetger also go to the ground, if you remember? A. Yes, sir.

Q. And did the struggle even continue while you were on the ground? A. Yes, sir.

Q. Approximately, how long did this struggle with Mr. Dawdy last? A. I would say approximately two to three minutes.

During this scuffle, Dawdy threw away the key that he had dropped earlier.

After Dawdy was handcuffed, he was patted down and put in a squad car. The patdown revealed a large wad of cash, over $4000. Gambell searched the passenger compartment of Dawdy's car and found a gram weight scale. A field test of the substance in the black pouch showed it was amphetamine.

The officers then decided to search the trunk but could not find the trunk key. They searched the area and found the key that Dawdy had thrown away. The key fit the trunk and a search of it revealed two large baggy-type envelopes containing about 371 grams of a white powdery substance that field tested as amphetamine.

Officers later determined that Dawdy did not own the car. The car was a rental vehicle.

On December 14 the State charged Dawdy and Pinney with two counts of assault while participating in a felony, interference with official acts, and possession of a narcotic substance with intent to deliver. A week later the State dismissed all of these charges against Dawdy.

On January 20, 1993, a federal indictment was returned against Dawdy and Pinney based on these events, alleging they were in possession of methamphetamine with the intent to distribute and alleging conspiracy to distribute methamphetamine. Two days la-

ter, the State filed a trial information against Dawdy and Pinney charging them with one count of failure to affix drug tax stamps under section 421A.12. The trial information also charged Dawdy with two counts of assault while participating in a felony.

In November, Dawdy filed motions to suppress all the evidence the officers seized during the search. Following a hearing, the court denied the motions. Later the court found Dawdy guilty of the drug tax stamp charge. The court sentenced Dawdy to a term not to exceed five years, suspended the sentence, and put Dawdy on probation for two years provided he remain employed for forty hours per week. The State dismissed the other charges.

Following the trial in state court, the federal district court in the federal case granted Dawdy's motion to suppress all of the evidence seized during the search except the pouch and its contents. Later, the Eighth Circuit Court of Appeals reversed that ruling. *See United States v. Dawdy,* 46 F.3d 1427, 1428 (8th Cir.1995). The Eighth Circuit has since denied Dawdy's petition for rehearing.

■ I. Even though an initial arrest is unlawful, a defendant has no right to resist the arrest. If the defendant does so, probable cause exists for a second arrest for resisting. A search incident to the second arrest is lawful. *United States v. Bailey,* 691 F.2d 1009, 1016–18 (11th Cir.1982) (even assuming initial arrest of defendant was unlawful, defendant had no right to flee and to strike agent in effort to escape attempts to recapture him, and thus probable cause existed for second arrest for resisting arrest, and search of defendant incident to the second arrest was lawful).

Strong policy reasons underlie this rule. As *Bailey* notes,

[a] contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct.... [E]xtending the fruits doctrine to immunize a defendant from arrest for *new* crimes gives a defendant an intolerable *carte blanche* to commit further crimi-

nal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct. This result is too far reaching and too high a price for society to pay in order to deter police misconduct.

*Id.* at 1017.

■ The Eighth Circuit relied on this rule in the federal prosecution as an additional justification for Dawdy's arrest and subsequent search. We note, approve, and adopt the following:

As an additional justification for Dawdy's arrest, the government notes that several courts consider resistance to even an illegal arrest to be grounds for a second, legitimate arrest. Although the Eighth Circuit has not previously addressed this precise issue, we now hold that a defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest.

In determining whether Dawdy's struggle with the state trooper provided such independent grounds for arrest, the dissent would have us consider the state trooper's subjective motivation for making the arrest. The standard for assessing probable cause, however, has long been an objective one. Traffic stops, for example, are measured by a standard of "objective reasonableness." Chief Justice Marshall noted that "the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation, and in all cases of seizure, has a fixed and well-known meaning." Probable cause for arrest or for search and seizure exists where the circumstances are "sufficient in themselves to warrant a man of reasonable caution in the belief" that criminal activity is in progress or has occurred. These conditions "are not technical, they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." The struggle that ensued when the state trooper attempted to handcuff Dawdy, though quickly suppressed, would provide a reasonable police officer with probable cause for an arrest under Iowa law. *See* Iowa Code Ann. § 804.12 (West 1994)

(stating that a person is not authorized to use force to resist an arrest ... even if the person believes that the arrest is unlawful or the arrest is in fact unlawful). Drawing again on the analogy to traffic stops, "we see no reason for requiring an officer's state of mind to perfectly match his legitimate actions." Thus, assuming *arguendo* that Christians' initial stop and arrest of Dawdy were invalid, Dawdy's resistance provided independent grounds for his arrest, and the evidence discovered in the subsequent searches of his person and his automobile is admissible.

*Dawdy,* 46 F.3d at 1430–31 (citations omitted).

Because Dawdy's resistance provided an independent ground for Dawdy's arrest, the search of his person was valid as a search incident to an arrest. *See State v. Canada,* 212 N.W.2d 430, 434 (Iowa 1973) (warrantless search incident to valid arrest, if properly limited, is reasonable, and arresting officer may search person arrested in order to remove any weapons arrestee might seek to use in order to resist arrest or effect escape and to prevent concealment or destruction of evidence); *see also Dawdy,* 46 F.3d at 1430. When the officers searched Dawdy's person, they found the large wad of cash. The district court correctly denied Dawdy's motion to suppress this evidence.

■ II. Because Dawdy was an occupant of a car, the officers could lawfully search the passenger compartment of the car, even though Dawdy was handcuffed and away from the car. *See State v. Edgington,* 487 N.W.2d 675, 677 (Iowa 1992) (if officer makes lawful custodial arrest of car occupant, the officer may, as contemporaneous incident of that arrest, search passenger compartment of car). The search of the passenger compartment of the car uncovered the gram weight scale. The district court correctly denied Dawdy's motion to suppress this evidence also.

■ III. In *Dawdy,* the court concluded that the officers' seizure of the pouch did not violate Dawdy's Fourth Amendment rights. The court reasoned that Dawdy had no legitimate expectation of privacy in the surface of the pavement near his car. The court did, however, find that the location of the pouch near Dawdy's car established a nexus between the pouch and Dawdy. The court summarized the facts establishing this nexus:

The pouch had apparently fallen to the ground only a short time earlier, since it lay on top of the slushy snow near the car, and both the open car window and Dawdy's repeated attempts to leave the car during the warrant check allowed opportunities for him to drop the pouch. In addition, Christians had just observed Dawdy drop a key to the ground from the open window. Although the officers did not ascertain the identity of the white powder in the pouch before arresting Dawdy, the probable cause standard was met by the existence of a "practical, nontechnical" probability that criminal evidence was involved.

*Dawdy,* 46 F.3d at 1430 (citations omitted). We agree with and adopt the court's conclusion and analysis.

■ The automobile exception to the Fourth Amendment requirement of a search warrant is applicable if probable cause and exigent circumstances exist when the police stop an automobile. *Edgington,* 487 N.W.2d at 678. Probable cause for the automobile search exists when the facts and circumstances would lead a reasonably prudent person to believe the automobile contains contraband. *Id.* The exigency requirement is satisfied when the automobile is mobile and the automobile's contents may never be found again if the police must obtain a warrant. *Id.*

Considering the totality of the circumstances, we think the State established probable cause to search the trunk of Dawdy's car. The large wad of cash found on Dawdy's person, the pouch containing a controlled substance, the scale found in the passenger compartment of the car, and Dawdy's attempt to get rid of the car trunk key are circumstances that gave the officers probable cause to believe the trunk might contain contraband. In addition, given the mobility of Dawdy's car, we think the State also established exigent circumstances to search the trunk.

When the officers opened the trunk, they found the amphetamine. The district court also correctly denied Dawdy's motion to suppress this evidence. *See Dawdy,* 46 F.3d at 1430 (holding that search and seizure of the methamphetamine found in the trunk of Dawdy's car did not violate Dawdy's Fourth Amendment rights).

Because we conclude the district court correctly denied Dawdy's motion to suppress all evidence seized following the stop of his vehicle, we affirm the district court's judgment of conviction and sentence.

**AFFIRMED.**