# IN THE SUPREME COURT OF IOWA

No. 20–0371

Submitted October 20, 2021—Filed January 14, 2022

**STATE OF IOWA,**

Appellee,

vs.

**EDNA JEAN WILSON,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Story County, Steven P. Van Marel, District Associate Judge.

The defendant challenges the denial of her motion to suppress evidence obtained during a warrantless search of her apartment to investigate a misdemeanor charge and conviction of interference with official acts. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Appel, J., delivered the opinion of the court, in which all justices joined.

Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Richard Bennett, Special Counsel, for appellee.

**APPEL, Justice.**

In this case, we consider whether evidence obtained by law enforcement after a warrantless entry into an apartment for a misdemeanor charge passes constitutional muster under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. For the reasons below, we conclude that the warrantless entry into Wilson's apartment to arrest her was unlawful. Therefore, evidence related to her conviction of possession of cocaine obtained from the unlawful entry must be suppressed. We also conclude, however, that Wilson's conviction of interference with official acts is sufficiently attenuated from the unlawful entry to permit admission of evidence of her own illegal conduct under the "new crime exception" to the exclusionary rule. So, Wilson's conviction for possession of cocaine is reversed, while her conviction of interference with official acts is affirmed.

**I. Factual and Procedural Background.**

**A. Investigation and Arrest.** Based on our review of the record, including the transcript of the suppression hearing and the exhibits, including bodycam videos of the incident,[1] we make the following findings of fact.

On July 5, 2019, Jamie Miller, a uniformed Ames police officer, was dispatched to a fourplex apartment building in Ames to investigate a noise

---

[1]We note that the bodycam videos were extremely helpful in determining the facts in this case and prevented the factual disputes in this case from descending into a swearing match between police officers and criminal defendants. As will be apparent in this opinion, the bodycams cut both for and against Wilson. The bodycams support her contention that the warrantless entry into the apartment was unlawful. On the other hand, the bodycams support the State's contention that by hindering her arrest, Wilson interfered with official acts.

complaint in violation of an Ames municipal ordinance. Once Miller arrived, he could hear noise while he was in the common hallway of the fourplex apartment. Miller, however, did not have equipment to measure the sound level necessary to determine if there was a violation of the noise ordinance but admitted that the level required for such a violation was "very high." Instead, Miller proceeded to knock on the door to the apartment. A woman came to the door and opened it between six to twelve inches in a guarded fashion in response to the knock. Miller identified himself as a police officer, explained that there had been a noise complaint, and proceeded to ask the woman for her name and some identification. Wilson initially refused to provide Miller with a name, stating she did not have to do so. Miller repeated his request several times, and eventually Wilson provided Miller with the name "Ebony."

Miller continued to press Wilson, asking for her complete name. After an unproductive exchange in which Wilson stated several times that she wanted her lawyer called, Wilson attempted to shut the door to her apartment. In response, Miller put his left hand on the doorway and his foot six inches across the threshold to prevent Wilson from shutting the door. Wilson asked Miller to remove his foot from her door six times, which Wilson refused to do. Wilson asked Miller where his warrant was, drawing a reply from Miller that he did not need a search warrant for her name.

Miller admitted that when he put his left hand on the door and foot six inches into the apartment, he had not determined that Wilson had provided a

false name, nor did he have reason to believe that Wilson possessed weapons or was engaged in drug violations.

After Miller prevented Wilson from closing her door, Wilson then provided Miller with a different name—Destiny Miller—after she glanced at Miller's name tag. Another uniformed Ames police officer on the scene, Adam McPherson, used the police database but was unable to find a "Destiny Miller" with the same birth date as provided by Wilson. In order to determine the true name of the occupant of the apartment, McPherson used his computer to search utilities records and determined that the person responsible for utilities at the apartment was Edna Wilson. When Miller confronted her with the name of Edna Wilson, Wilson confirmed that it was her name.

Upon confirmation that her name was Edna Wilson, and not Destiny Miller, Miller decided to arrest Wilson for obstruction of justice by providing the police with a false name. Miller advised Wilson that she was under arrest, stepped further into the apartment, and began the process of placing her in handcuffs. As the officers entered the apartment to arrest Wilson, McPherson saw Wilson throw an object from her hand. A close look at the bodycam video shows that the object was thrown around the time when the two officers grasped Wilson's arms to effectuate the arrest. Miller first held Wilson's left arm while McPherson was approaching Wilson. Then, as McPherson was getting closer, Wilson quickly stretched out her free right hand to toss away the vial. Immediately after Wilson threw the object away, McPherson was able to grab and handcuff Wilson's right hand. After both hands were handcuffed, she started to

twist, making it hard for the officer to secure her arrest. The officers later observed a white powdery residue on the floor and a small vial. They also located a marijuana joint and a baggie containing two grams of marijuana.

During the arrest, Wilson protested using profanity, accused the police of harassment, and asked others in the apartment to call her lawyer. She was not generally cooperative as Miller and McPherson tried to handcuff her behind her back, twisting her body and arms in a fashion that made the arrest more difficult than it needed to be. Miller suffered a cut and scrape to his left arm as a result of his effort to handcuff Wilson. After Wilson's arrest, McPherson applied for a search warrant for the apartment based upon what officers observed inside the apartment. The search warrant was issued, and the police executed the warrant. The white substance in the vial later tested as .6 grams of cocaine salt.

The State charged Wilson with interference with official acts causing bodily injury, possession of marijuana, second offense, and possession of cocaine, first offense. The cocaine charge was later amended to a second offense. Wilson pleaded not guilty and waived speedy trial.

**B. Motion to Suppress.** Wilson filed a motion to suppress, alleging that the officer made an illegal warrantless entry into her home, and then used the information obtained from the illegal entry to obtain a search warrant. Wilson argued that a warrantless entry into the home was unlawful under the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. The State countered that Miller had no reasonable expectation of privacy because she opened the door of the residence and was in plain view when

the officers determined to arrest her. The State further asserted that the evidence was admissible under the new crime exception to the exclusionary rule. According to the State, the new crime was interference with official acts when Wilson hindered or resisted her arrest.

The district court denied the motion to suppress. The district court found that there was no question that by placing his hand on the door and foot past the door threshold, the officer broke the plane of Wilson's apartment. Relying on *United States v. Santana*, 427 U.S. 38 (1976), however, the district court found that Wilson had no reasonable expectation of privacy in the entryway to the apartment. Further, the district court observed that a crime was being committed in the presence of the police officers, namely, harassment of public officials by providing a false name. As a result, the officers had a right to arrest Miller.

After the motion to suppress was denied, Wilson submitted to a bench trial pursuant to an agreement with the State. The State amended count I to interference with official acts, a simple misdemeanor, and agreed to dismiss the possession of marijuana charge. The trial court found Wilson guilty of the count I interference charge and of the count III charge of possession of cocaine, second offense.

**C. Appeal.** Wilson appealed, arguing that the district court erred in denying her motion to suppress and that there was insufficient evidence to support the State's interference charge. We transferred the case to the court of appeals. The court of appeals assumed, without deciding, that the initial entry

by Miller violated the Fourth Amendment. But when Wilson resisted arrest, the court of appeals observed that "she created probable cause that she was committing a new crime." According to the court of appeals, when Wilson resisted arrest, she provided law enforcement with new grounds to arrest her. Consequently, the court of appeals held that the narcotics discovered as a result of Miller's lawful arrest were not subject to suppression and affirmed the district court's judgment.

Wilson sought further review, which we granted.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right, our standard of review is de novo." *State v. Coffman*, 914 N.W.2d 240, 244 (Iowa 2018) (quoting *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017)). "We examine the whole record and 'make an independent evaluation of the totality of the circumstances.' " *Id.* (quoting *Storm*, 898 N.W.2d at 144). "Each case must be evaluated in light of its unique circumstances." *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012) (quoting *State v. Krogmann*, 804 N.W.2d 518, 523 (Iowa 2011)). In seeking to sustain an exception to the warrant requirement, the state bears the burden of proof. *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984); *Payton v. New York*, 445 U.S. 573, 586–87 (1980).

**III. Analysis.**

**A. Positions of the Parties.**

1. *Wilson.* Wilson asserts that Miller entered her apartment without a warrant when he put his hand on the door and foot past the door jamb into the apartment. She asserts that the intrusion into her home by Miller violated her reasonable expectation of privacy in her apartment. According to Wilson, she only opened the door as necessary to respond to the knock on the door by the police. In so doing, she claims she did not expose her apartment to public view and did not abandon her right of privacy in her residence.

Wilson recognizes that in *Santana*, the United States Supreme Court held that a person in her open doorway when the police observed her cannot claim a reasonable expectation of privacy. 427 U.S. at 42. Wilson, however, maintains she was not standing in an open doorway when the police arrived but only opened the door so far as to respond to the knock of the police. When she attempted to terminate the encounter, Miller then intruded into the residence by preventing her from closing the door. Under these circumstances, Wilson suggests, there is no surrender of the reasonable expectation of privacy of the home. *See Cummings v. City of Akron*, 418 F.3d 676, 686 (6th Cir. 2005) (holding that opening the door very slightly at the request of the police does not constitute exposing oneself to the public view and therefore there was no surrender of legitimate expectation of privacy).

Wilson also argues that the case *State v. Legg*, 633 N.W.2d 763 (Iowa 2001)—relied on by the State—is distinguishable. In *Legg,* an officer followed the

defendant into her garage after she failed to stop for a traffic violation. *Id.* at 765. The *Legg* court found the officer's warrantless entry unreasonably invaded her protected privacy interests. *Id.* at 771–74. But according to the *Legg* court, the arrest was not unreasonable because the officer had probable cause to arrest her for a serious misdemeanor (OWI). *Id.* at 773. Further, the probable cause to arrest for an OWI was supported by exigent circumstances because Legg could have accessed alcohol in an effort to impair the reliability of test results. *Id.* at 772. Here, Wilson argues that the crime that is advanced to support the warrantless arrest of Wilson was a simple misdemeanor, not a serious misdemeanor. Further, the police identified no exigent circumstances requiring the arrest of Wilson.

Wilson recognizes that the officers were investigating a noise complaint and that Wilson eventually provided a false name to the officers. But Wilson maintains that there was no evidence that the noise ordinance of the City of Ames was violated. Further, according to Wilson, the interference arising from the giving of a false name is a simple misdemeanor. These are not the kind of "grave offenses" that justify a warrantless intrusion of the home.

In support of her claim that the officers lacked a basis for warrantless entry of Wilson's home based on minor crimes, Wilson cites *Welsh v. Wisconsin*, 466 U.S. 740. She also cites one of this court's first search and seizure cases, *McClurg v. Brenton*, we stated: "No amount of incriminating evidence, whatever its source, will supply the place of such warrant. At the closed door of the home,

be it palace or hovel, even bloodhounds must wait till the law, by authoritative process, bids it open." 98 N.W. 881, 882 (Iowa 1904).

Wilson recognizes that Miller may have had probable cause regarding the noise complaint and the provision of a false name to the officers. But, according to Wilson, there were no exigent circumstances or other exceptions to the warrant requirement available to justify a warrantless search of Wilson's home for these minor offenses. *See State v. Naujoks*, 637 N.W.2d 101, 108–10 (Iowa 2001).

Finally, Wilson addresses the State's contention that even if the initial entry was unlawful, Wilson committed a new crime when she resisted arrest, and the evidence of drug possession was admissible as a result of the search arising from it. Wilson points us to the language of Iowa Code section 719.1(1)(*a*) (2019), regarding interference with official acts. The language of this Code section specifically requires that in order to commit the crime of interference with official acts, the act must be "within the scope of the lawful duty or authority" of the officer. *Id.* Wilson argues that at the time of the further warrantless intrusion into Wilson's apartment, the officers were not acting "within the scope of the lawful duty or authority" of the police, and as a result, no interference occurred under the statute. This statutory argument appears not to have been raised in *State v. Dawdy*, 533 N.W.2d 551 (Iowa 1995)—another case relied upon by the State.

In the alternative, Wilson asserts that the record lacks substantial evidence that Wilson resisted or obstructed her arrest. Citing *Lawyer v. City of*

*Council Bluffs*, 361 F.3d 1099, 1107 (8th Cir. 2004), Wilson asserts that "the key question is whether the officer's actions were hindered." While Wilson may have been "yelling and screaming" during the arrest, Wilson asserts that objecting or even passively failing to cooperate does not establish interference. Instead, asserts Wilson, there must be evidence of active interference with law enforcement. *See Small v. McCrystal*, 708 F.3d 997, 1004–05 (8th Cir. 2013).

2. *Position of the State.* The State argues that because Wilson opened the door to police when they knocked and stood on the threshold of her home that she had no reasonable expectation of privacy needed to trigger the special protections afforded to the home under the Fourth Amendment. *See Santana*, 427 U.S. at 42. The State also finds support in a number of federal appellate court cases. *See United States v. Gori*, 230 F.3d 44, 54 (2d Cir. 2000) (finding when a door is voluntarily opened by an occupant, the Fourth Amendment's protection of the home were not implicated); *United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir. 1987) (holding the arrest was effected before the agents entered the room, therefore there was no protectable expectation of privacy at the time of the arrest). Because Wilson was in a public place, the State argues, police officers were free to arrest her "for an offense committed or attempted in their presence," including disorderly conduct (the noise emitting from her apartment) and providing false identification information. *See* Iowa Code § 804.7(1); *see also United States v. Watson*, 423 U.S. 411, 423–24 (1976) (holding warrantless public arrests on probable cause do not violate the Fourth Amendment).

In the alternative, the State maintains that even if *Santana* and its progeny do not apply, the officers had probable cause to arrest Wilson for the ongoing crimes of disorderly conduct and interference with official acts. The State claims that *Welsh* applies only to civil infractions and not to crimes that involve imprisonment. The State asserts that the crimes of disorderly conduct, providing false information, and interference with official acts are simple misdemeanors punishable by a fine or imprisonment not to exceed thirty days. *See* Iowa Code §§ 719.1(1)(*a*) (interference with official acts), .1A (false identification); *id.* § 723.4(1) (disorderly conduct); *id.* § 903.1 (simple misdemeanor punishment). As a result, the State claims they are outside the scope of the categorical rule in *Welsh*.

Finally, the State asserts that even if the police entry were unlawful, the evidence need not be suppressed because Wilson committed a new crime when she resisted arrest. In support of its argument, the State cites *Dawdy*, 533 N.W.2d 551. In *Dawdy*, the court declared: "Even though an initial arrest is unlawful, a defendant has no right to resist the arrest. If the defendant does so, probable cause exists for a second arrest for resisting. A search incident to the second arrest is lawful." *Id.* at 555. The rationale of the rule is that a defendant should not be given carte blanche to commit further criminal acts simply because the causal chain began with police misconduct. *See United States v. Bailey*, 691 F.2d 1009, 1016–18 (11th Cir. 1982).

**B. Overview of Search and Seizure Principles.**

1. *Invasion of the home: chief evil at the core.* We start with a basic proposition that police intrusion into the home implicates the very core of the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution.[2] On the eve of the American Revolution, Lord Chief Justice Pratt declared that " '[t]o enter a man's house' without a proper warrant . . . is to attack 'the liberty of the subject' and 'destroy the liberty of the kingdom,' " *Lange v. California*, 141 S. Ct. 2011, 2023 (2021) (quoting *Huckle v. Money* (1763) 95 Eng. Rep. 768, 769). The lessons of recent English precedents were incorporated into the United States Constitution through the Fourth Amendment. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton*, 445 U.S. at 585–86 (quoting *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313 (1972)). "Freedom" in one's own "dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Id.* at 587 (quoting *Dorman v. United States*, 435 F.2d 385, 389 (D.C. Cir. 1970) (en banc)). At the "very core" of the Fourth Amendment "stands 'the right of a [resident] to retreat into [one's] own home and there be free from unreasonable governmental intrusion.' " *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (quoting *Florida v. Jardines*, 569 U.S. 1, 6 (2013)). "[W]hen it

---

[2]Wilson brings her search and seizure claim under both the Fourth Amendment of the United States Constitution and article I, section 8 of the Iowa Constitution. She does not suggest that the Iowa Constitution should be interpreted in a fashion different from the federal framework. We therefore consider both claims but apply the federal framework, reserving the right to apply that framework in a fashion different from federal law. *King v. State*, 797 N.W.2d 565, 571 (Iowa 2012); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at 6.

Because interests in privacy and security[3] in the home are so fundamental, the United States Supreme Court has declared that "a firm line" is drawn for search and seizure principals at the entrance to the home. *Payton*, 445 U.S. at 589–90. "[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch' [i]s too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)). A violation occurs when a lawfully present officer moves a turntable only "a few inches." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987) ("[T]aking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of respondent's privacy . . . .").

The magisterial terms of the classic search and seizure are based on what we all know: the home is a remarkable place. It is a place of solitude and group activity, love and tears, arguments and forgiveness, grace and selfishness, individual expression and collective decisions, couch surfing and weight lifting, fine wine and bad beer, live goldfish and dead pizza, clothing that is too loose, clothing that is too tight, diaries and personal notes, and prescription drugs and

---

[3]Wilson does not specifically mention "secure" or "security" in her appellate brief, but both the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution utilize the term in their text. The concept of security in search and seizure law historically has not received much attention. That may be beginning to change. *See generally* David H. Gans, *"We Do Not Want to be Hunted": The Right to Be Secure and Our Constitutional Story of Race and Policing*, 11 Colum. J. Race & L. 239 (2021) (providing a comprehensive account of the text, history, and original meaning on the Fourteenth Amendment's limitations on policing); Luke M. Milligan, *The Forgotten Right to be Secure*, 65 Hastings L.J. 713 (2014) (discussing the "to be secure" text of the Fourth Amendment and arguing for a broader interpretation as an alternative method to control the costs of regulatory delay).

intimate items. It is the place where we learn to crawl and where we want to be when we die, where marriages prosper and fail, where family problems are discussed over the kitchen table, and where the new in-laws come seeking, and sometimes getting, acceptance. And on and on. The precedents demonstrate that privacy of the home is fortified by strong constitutional protection.

2. *Jealously guarding the home by drawing lines: trespass and reasonable expectation of privacy.* In *State v. Wright*, we recently noted that a search and seizure violation under article I, section 8 of the Iowa Constitution may occur "when, without a warrant, the officer physically trespasses on protected property." 961 N.W.2d 396, 416 (Iowa 2021). This notion fits comfortably with the declaration of the Supreme Court in *Kyllo v. United States* that an invasion of even an inch in the home is a constitutional violation. 533 U.S. at 37. In the alternative, we also have recognized that a defendant may establish a legitimate expectation of privacy in the premises searched. *State v. Nitcher*, 720 N.W.2d 547, 553–54 (Iowa 2006); *Naujoks*, 637 N.W.2d at 106–07. Whether a person has a legitimate expectation of privacy is decided on a case-by-case basis. *Naujoks*, 637 N.W.2d at 106–07.

3. *Exigent circumstances supporting warrantless misdemeanor arrests: rare.* Exigent circumstances have been recognized as one of the "narrowly and jealousy drawn exceptions to the warrant requirement" that applies even to entry of homes. *State v. Day*, 168 P.3d 1265, 1267 (Wash. 2007) (en banc) (quoting *State v. Stroud*, 720 P.2d 436, 438 (Wash. 1986) (en banc), *overruled on other grounds by State v. Valdez*, 224 P.3d 751 (Wash. 2009) (en banc)). Exigent

circumstances include a risk of serious injury, a threat to officer safety, and a likelihood of destruction of evidence. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

The United States Supreme Court considered whether the mere fact that a person has committed a misdemeanor permits law enforcement to enter the home without a warrant to arrest the offender in *Welsh*, 466 U.S. 740—the key United States Supreme Court case in this area. In the *Welsh* case, the state engaged in a warrantless search of a home to arrest an OWI offender. *Id.* at 742–43. Under Wisconsin law, the OWI offense in *Welsh* was nonjailable. *Id.* at 754. The central question in *Welsh* was whether the warrantless seizure could be considered justified by exigent circumstances. *Id.* at 750.

The Supreme Court said no. *Id.* at 753. The *Welsh* Court noted that in *Payton v. New York*, warrantless arrests of felons was found to be prohibited by the Fourth Amendment absent exigent circumstances. *Id.* at 749. Such exigent circumstances are not likely to be found where minor crimes are involved. *Id.* at 750. *Welsh* cited the famous words of Justice Jackson in his concurrence in *McDonald v. United States*, 335 U.S. 451 (1948), stating that law enforcement seeking to avoid the warrant requirement in the context of the case involving a minor offense showed

> a shocking lack of proportion. Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it. . . . It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any

suspicious police officer engaged in following up offenses that involve no violence or threats of it.

*Welsh,* 466 U.S. at 750–51 (quoting *McDonald,* 335 U.S. at 459 (Jackson, J., concurring)). Justice Jackson further commented in *McDonald* on the lack of a magistrate's involvement in finding probable cause to search a home, stating: "When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." 335 U.S. at 460.

The *Welsh* Court made clear that the minor nature of a crime is a major factor to consider in determining whether exigent circumstances are present. 466 U.S. at 753. The *Welsh* Court declared that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.*

The question of warrantless searches for misdemeanors came back to the United States Supreme Court in *Lange v. California,* 141 S. Ct. 2011. In *Lange,* an obnoxious driver who was signaled to pull over by the police drove for four seconds to his driveway and went into his attached garage. *Id.* at 2016. The patrol officer followed him into the structure to make an arrest. *Id.* The state defended the warrantless arrest on the ground that the Fourth Amendment always permits law enforcement to enter the home to arrest a fleeing misdemeanor defendant. *Id.*

The Supreme Court rejected the argument. *Id.* at 2018–24. The *Lange* Court noted that the exigent-circumstances exception was designed for

situations presenting a "compelling need for official action and no time to secure a warrant." *Id.* at 2017 (quoting *Missouri v. McNeely*, 569 U.S. 141, 149 (2013)). The exigent-circumstances exception, according to the *Lange* Court, was "case specific." *Id.* at 2018.

Each year, millions of Americans are prosecuted for misdemeanors. Many commentators have noted, generally unfavorably, about the presence of misdemeanor crimes in every aspect of the American life. *See, e.g.*, Issa Kohler-Hausmann, *Managerial Justice and Mass Misdemeanors*, 66 Stan. L. Rev. 611, 629–39 (2014) (outlining and discussing the data demonstrating the dramatic rise in misdemeanors beginning in the mid-1990s in New York City); Sandra G. Mayson & Megan T. Stevenson, *Misdemeanors by the Numbers*, 61 B.C. L. Rev. 971, 1014–19 (2020) (discussing her takeaways from misdemeanor data, including that misdemeanor systems affect a tremendous number of people and disproportionately affect people of color). Given the ubiquity of misdemeanor offenses, a low bar to warrantless entry of the home would give police discretion that resembles a general warrant and is subject to arbitrary enforcement. As noted in a recent federal appellate court case, "[I]f the presumption against warrantless entries stemming from minor crimes is to have any meaning, the exigency must be a serious one in that context." *Smith v. Stoneburner*, 716 F.3d 926, 931 (6th Cir. 2013). Otherwise, simple misdemeanors could lead to millions of home invasions for, say, violation of a noise ordinance. *Bash v. Patrick*, 608 F. Supp. 2d 1285, 1290 (M.D. Ala 2009).

4. *Does opening the door to the home open the door to a warrantless search of misdemeanants?* An important issue percolating through the search and seizure cases is whether a resident who opens the door to respond to the knock of officers surrenders the privacy protected by the Fourth Amendment or similar state constitutional provisions where the officers have probable cause to believe the resident has committed a misdemeanor.

Recent court cases have focused on *Santana*, 427 U.S. 38. In *Santana*, police drove to the home of Santana and found her in the doorway of her home. *Id.* at 40. When they got out of their vehicles, Santana retreated into her home's vestibule. *Id.* The officers followed her into the house and discovered heroin. *Id.*

The *Santana* Court upheld the warrantless search. *Id.* at 43. The *Santana* Court emphasized, however, that the case involved "a realistic expectation that any delay would result in destruction of evidence." *Id.* Further, the case involved a felony. *Id.* at 41. Finally, because of the location of Santana standing in her doorway looking, the incident "ha[d] been set in motion in a public place." *Id.*

Recently, the United States Supreme Court in *Lange* addressed the meaning of *Santana* in the context of whether it should be broadly construed to permit warrantless entry into the home to arrest misdemeanants. *Lange*, 141 S. Ct. at 2019. The *Lange* Court answered the question in the negative. *Id.* at 2019–20. The *Lange* Court emphasized that in *Santana*, the crime that generated the pursuit involved a felony, not a misdemeanor. *Id.* at 2020. Further, the *Lange* Court reasoned that the facts in *Santana* showed exigent circumstances because there was an appreciable risk of destruction of evidence.

*Id.* at 2018. But the *Lange* Court held that *Santana* did not authorize warrantless entry to arrest misdemeanants. *Id.* at 2020. According to *Lange,* the members of the Court "are not eager—more the reverse—to print a new permission slip for entering the home without a warrant." *Id.* at 2019.

5. *New crime exception to the exclusionary rule.* The exception to the exclusionary rule urged by the State in this case is the new crime exception. As explained in *Dawdy*, under the new crime exception: "Even though an initial arrest is unlawful, a defendant has no right to resist the arrest. If the defendant does so, probable cause exists for a second arrest for resisting. A search incident to the second arrest is lawful." *Id.*

The new crime exception has not been universally endorsed. Two cases are worthy of note. In *Jones v. State,* the Delaware Supreme Court rejected application of the new crime exception in a case where the new crime was resisting arrest. 745 A.2d 856, 873–74 (Del. 1999). According to the *Jones* court, to contend that evidence that was obtained pursuant to an unlawful *Terry*-type stop is admissible because of events that occurred because of the illegal conduct is "a bootstrap analysis." *Id.* at 873. Similarly, in *State v. Beauchesne*, the New Hampshire Supreme Court rejected application of the new crime exception where an officer unlawfully grabbed a defendant who then threw something away. 868 A.2d 972, 975, 983–84 (N.H. 2005). Subsequent search of the defendant's person revealed cocaine. *Id.* at 975. The *Beauchesne* court engaged in a balancing analysis, concluding that the interest in enforcing the law regarding resisting arrest had to be weighed against the abuse that could occur if evidence

obtained as a result of an illegal arrest was used against a defendant. *Id.* at 983–84.

**C. Discussion.** We begin by considering whether Wilson had a constitutional interest in protecting her home under the facts presented. We conclude that she did. Wilson only opened the door as necessary to respond to Miller's knock. She did not expose herself or her apartment to the public in plain view. And, she sought to close the door, as she was entitled to do, after an unproductive exchange with Miller. It is hard to see how such conduct surrendered Wilson's expectation of privacy and permitted police to enter her apartment to effect a custodial arrest. *See Morse v. Cloutier*, 869 F.3d 16, 27 (1st Cir. 2017) (finding no surrender of privacy when answering door in response to a knock); *United States v. Allen*, 813 F.3d 76, 82 (2d Cir. 2016) ("[W]here law enforcement officers have summoned a suspect to the door of his home, and he remains inside the home's confines, they may not effect a warrantless 'across the threshold' arrest in the absence of exigent circumstances."); *LaLonde v. County of Riverside*, 204 F.3d 947, 955 (9th Cir. 2000) (finding no surrender of privacy where officers were standing at the doorway and the defendant was a few feet inside door answering questions and holding that subsequent crossing of threshold was an illegal entry); *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) (holding that the right to privacy is not surrendered by answering the door in response to a knock and recognizing that the right to close the door to one's dwelling and exclude people from entering is one of the most important elements of personal privacy); *United States v. McCraw*, 920 F.2d at 229 (4th Cir.

1990) (holding that partially opening a door to determine the identity of persons knocking on the door does not surrender privacy in the home); *State v. Maland*, 103 P.3d 430, 435 (Idaho 2004) (recognizing that there is no surrender of expectation of privacy when opening a door in response to a knock); *see also Kentucky v. King*, 563 U.S. 452, 470 (2011) ("[E]ven if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.").

We think *Santana* is not applicable in this case. In *Santana*, when the suspect spotted police coming toward her home to conduct an arrest without a warrant, she retreated to the confines of her home. 427 U.S. at 40. Further, when they arrested the defendant, the defendant was standing on her threshold and was thus in a "public" place where "[s]he was not merely visible to the public but was as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house." *Id.* at 42. Here, Wilson was not standing outside her home when the encounter began and was not standing on the threshold of her home when she was arrested. She was inside her home and only opened the door a crack when she heard a knock at the door. She then sought to terminate the encounter. We do not believe under these circumstances that Wilson abandoned any privacy of the home beyond what police officers could see through the partially opened doorway.

Further, the reasonable expectation of privacy test is not the only test to determine whether the officers acted unlawfully when they entered the

apartment. In *Wright*, we stated that "[w]ithin the meaning of article I, section 8, an officer acts unreasonably when, without a warrant, the officer physically trespasses on protected property." 961 N.W.2d at 416. Here, the officers violated article I, section 8 when they committed a trespass. As Miller's body camera footage clearly shows, he put his foot in the door so Wilson could not close it. He was asked by Wilson to remove his foot from her home six times. When asked to show her a search warrant authorizing his presence at her home, Miller told Wilson "I don't need a warrant." And, finally, the officers proceeded to enter the apartment to arrest Wilson, clearly without her consent.

The next question is whether probable cause that Wilson committed minor crimes was sufficient to justify a warrantless search of her apartment. We think not. In *Welsh*, the Supreme Court declared it is a categorical rule that only "rarely" should a misdemeanor support the warrantless search of the home. 466 U.S. at 753. The Supreme Court in *Lange* made it clear that the proportionality theme in *Welsh* was not limited to civil infractions but to "minor" infractions. *Lange*, 141 S. Ct. at 2020–22.

We do not find that *Santana* supports the State's position. In *Santana*, the entry into the defendant's house was justified by the exigent circumstance of "hot pursuit" of a fleeing felon. *Santana*, 427 U.S. at 42–43. There was no hot pursuit of a fleeing felon in this case. Wilson committed only a simple misdemeanor. Further, while on appeal, the State claims that there was reasonable suspicion that Wilson was engaged in disorderly conduct, a misdemeanor, that issue was not presented to the district court and is not

preserved on appeal. In any event, a different misdemeanor does not change our analysis of *Welsh* and *Santana.*

In short, there were two unlawful invasions of Wilson's home. The first occurred when the officer put his hand on the door and foot past the threshold. The second occurred when Miller and McPherson entered the apartment to make the arrest on Wilson.

Finally, we consider the new crime exception to the exclusionary rule. The new crime exception is a relatively obscure and rarely invoked exception to the exclusionary rule. This court first recognized the exception in 1995 in *Dawdy*, 533 N.W.2d 551. *Dawdy* involved an automobile stop that the defendant alleged was unlawful. *Id.* at 552. In *Dawdy*, this court assumed that the initial stop was unlawful. *Id.* at 553. After the stop, the defendant resisted arrest. *Id.* at 554. The *Dawdy* court declared: "Even though an initial arrest is unlawful, a defendant has no right to resist the arrest. If the defendant does so, probable cause exists for a second arrest for resisting. A search incident to the second arrest is lawful." *Id.* at 555.

The *Dawdy* court stated that strong policy reasons underlie this rule, noting that a contrary rule would virtually immunize a defendant from prosecution for all crimes the defendant might commit that have a sufficient causal connection to the police misconduct. *Id.* Further, extending the fruit of the poisonous tree doctrine to immunize a defendant from arrest for a new crime gives the defendant an intolerable carte blanche to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by

the police misconduct. *Id.* The *Dawdy* court reasoned that this result is too far-reaching and too high a price for society to pay in order to deter police misconduct. *Id.*

Wilson does not respond to the State's assertion that federal law recognizes a new crime exception to the Fourth Amendment. Further, she does not suggest that a different standard than that found in the federal caselaw should be applied under the Iowa Constitution. Under these circumstances, we use the standards for the new crime exception under federal law, but we reserve the right to apply the exception in a different fashion. *See NextEra Energy Res. LLC v. Iowa Utils. Bd.*, 815 N.W.2d 30, 45 (Iowa 2012); *State v. Oliver*, 812 N.W.2d 636, 650 (Iowa 2012); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

Wilson also advances the statutory argument that her conduct did not fall within the scope of Iowa Code section 719.1(1)(*a*) because her *initial* arrest violated the Fourth Amendment and article I, section 8. Because her arrest was unlawful under the Fourth Amendment and article I, section 8, Wilson reasons that the arrest was not "within the scope of the lawful duty or authority of [the] officer." Iowa Code § 719.1(1)(*a*). She further suggests that, in any event, there was insufficient evidence to support her conviction of interference with official acts.

We first address the question of whether interference with official acts occurred when the officers made an unlawful entry. The precise question, at least in Wilson's appellate brief, is whether officers are acting "within the scope of their lawful duties and authorities" when they enter an apartment to make an arrest

that turns out to be an unconstitutional seizure. This specific question was not addressed in *Dawdy*.

The question is impacted—if not controlled—by *State v. Thomas*, 262 N.W.2d 607 (Iowa 1978). In *Thomas*, this court considered whether a defendant could be convicted of resisting arrest even though the arrests were illegal. *Id.* at 610–11. Assuming the arrest to be illegal, we declared that "we [were] not prepared to endorse or excuse their resistance []hereto." *Id.* at 610. We noted that Iowa had enacted a statute expressly stating that "[a] person is not authorized to use force to resist an arrest, either of [the person's self] or another[,] . . . by a peace officer . . . , even if the person believes that the arrest is unlawful or the arrest is in fact unlawful." *Id.* at 611 (quoting Iowa Code § 804.12 (Supp. 1977)). Further, we overruled our prior cases regarding common law immunity for resisting unlawful arrests. *Id.* at 610–11. Although the *Thomas* case is not a model of clarity, it appears to endorse the notion that when the statute refers to "legal authority" to make arrests, it does not exclude arrests that later turn out to be unlawful under and seizure principles. *Id.* at 611.

Notwithstanding the above, our examination of the transcript of the hearing on the motion to suppress and the order of the district court reveals that the question of interpretation of the statutory language in Iowa Code section 719.1(1)(*a*) was not presented to or decided by the district court. As a result, the question is not preserved. *See Meier v. Senecaut*, 641 N.W.2d 532, 537–41 (Iowa 2002).

The next question is whether Wilson was actually engaged in interference with official acts by resisting arrest. Examination of the bodycam video footage is the key. At the outset, we note that the standard for establishing a violation of the interference with official acts statute is generally fairly low. As noted in *Lawyer*, "[t]he key question is whether the officer's actions were hindered." 361 F.3d at 1107; *see also State v. Donner*, 243 N.W.2d 850, 864 (Iowa 1976) (stating that evidence is sufficient where the person charged engaged in actual opposition to the officer to the use of actual or constructive force). In our view, the bodycam videos reveal that Wilson did hinder the arrest, not by her language, her calls for a lawyer, or her profanity, but by her twisting and jostling around while officers attempted to place handcuffs on her. It may be that the handcuffs were originally uncomfortably placed, but she was not cooperative as police tried to deal with the situation. It took several minutes to make the arrest. Given the rather low standard for interference with official acts, we conclude that there was sufficient evidence to support her conviction.

We now consider the application of the new crime exception to this case. Based on our review of the record, Wilson threw the vial of cocaine on the floor prior to her resisting arrest. The bodycam video of McPherson shows that he had only approached Wilson and was at the very early stages of subduing her when the drugs were thrown. Prior to throwing of the cocaine, there is no evidence yet that Wilson was resisting arrest. Thus, McPherson saw the drug thrown prior to the new crime of interference with official acts.

Whether the cocaine evidence was discovered prior to Wilson's beginning the new crime of interference as a result of the illegal entry of the officers raises a timing question that has been considered by at least one federal court. In *United States v. Gaines,* the Fourth Circuit Court of Appeals considered whether the defendant's commission of a crime *after* discovery of a gun by police is admissible under the new crime exception. 668 F.3d 170, 171 (4th Cir. 2012). The court said no. *Id.* at 174. The court employed the attenuation analysis of *Wong Sun v. United States*, 371 U.S. 471, 491–92 (1963). *Gaines*, 668 F.3d at 173–75. Where the new crime was committed after the discovery of the gun, the new crime did not amount to an intervening act that severed the relationship of the discovery of the gun to prior police illegality. *Id.* at 174–75. As a result, the evidence of the gun was suppressed. *Id.* at 176. A similar approach was applied in *United States v. Camacho,* 661 F.3d 718, 730–31 (1st Cir. 2011) (finding that the exclusionary rule applied where police discovered a gun after an illegal search but before the defendant shoved the police officer), and *United States v. Beauchamp*, 659 F.3d 560, 573–75 (6th Cir. 2011) (excluding evidence discovered by police subsequent to illegal police action but before new crime of attempted flight).

We find the analysis in *Gaines* persuasive. In this case, the white powder and vial were not uncovered as a result of a new crime of interference, but as a result of the original illegal entry. Because the discovery of the throwing of the substance was not linked to the new crime but to the illegal entry, we conclude it should have been suppressed.

This case involved a trial on the minutes. The minutes included reference to the cocaine that should have been excluded. We think the job of excising evidence that should have been suppressed from the minutes and considering whether there is substantial evidence to support the conviction based on the minutes is a question to be considered by the district court in the first instance. We therefore vacate Wilson's conviction of possession of cocaine and remand the case to the district court for further proceedings.

**IV. Conclusion.**

For the above reasons, we affirm Wilson's conviction of interference with official acts but vacate Wilson's conviction of possession of cocaine and remand the case to the district court for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**